IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS

MAY 2 2 2003

DAVID J. MALAND, CLERK
BY
DEPUTY

| | | |
|---|---|---|
| ELECTRONIC DATA SYSTEMS CORPORATION, | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 4:02CV225 |
| FRED G. STEINGRABER, | § § | |
| Defendant. | § § | |

---

**PLAINTIFF ELECTRONIC DATA SYSTEMS CORPORATION'S
MOTION TO COMPEL (1) DATABASES AND OTHER DOCUMENTS RELATED
TO THE ANALYTICAL CHARTS STEINGRABER PROVIDED TO EDS;
AND (2) IDENTIFICATION OF FACT WITNESSES**

---

Weston C. Loegering
State Bar No. 12481550

HUGHES & LUCE, L.L.P.
1717 Main Street, Suite 2800
Dallas, TX  75201
Telephone:     (214) 939-5500
Facsimile:     (214) 939-6100

Martin T. Wymer (OH 0004004)
Stephen C. Sutton (OH 0055646)
DUVIN, CAHN & HUTTON
Erieview Tower - 20th Floor
1301 East Ninth Street
Cleveland, OH  44114
Telephone:     (216) 696-7600
Facsimile:     (216) 696-2038

ATTORNEYS FOR ELECTRONIC DATA
SYSTEMS CORPORATION

43:2

001177.01381:780053.01

**A.    Steingraber Should Be Compelled to Produce Databases or Other Documents Related to the Analytical Charts He Provided to EDS**

Fred Steingraber was fired by EDS after he engaged in systematic misconduct concerning his expense reports, including repeated instances of "double-dipping," – *i.e.,* obtaining reimbursement for expenses from both EDS and third-party corporations for which Steingraber served on the board of directors.  On April 2, 2003, Steingraber sent a letter to Gil Friedlander, General Counsel to EDS, which cited an analysis that has been conducted of his expense reports for a period of several years.  Before admitting that he owed EDS an additional $22,259.02 for purported "over payments," Steingraber elaborated upon his analysis of his expense reimbursement requests and also described the basis for the charts attached to his letter in support of the admissions and contentions contained therein:

> We have finished our analysis of my expense reports to ATK and the outside boards on which I served between January 1, 1995 and August 5, 2002. Our analysis *involved* a comprehensive review and comparison of all 11,000-plus expense items listed on the expense reports, *not simply the items that are the subject of EDS' allegations in the Amended Complaint.*

(Exhibit 1, April 2, 2003 letter with attached charts explaining that, among other things, one of the charts "itemizes *all of the errors* that resulted in double billing of expenses.") (emphasis added).  Perhaps anticipating that EDS would want to review the information upon which these charts were based, Steingraber concluded his letter by inviting Mr. Friedlander to contact his attorneys if he had questions about "the enclosed calculations or the documentation on which they [were] based."  *Id.*

Accordingly, on April 25, 2003, EDS' counsel requested Steingraber's attorneys to produce materials related to the analytical charts:

PLAINTIFF ELECTRONIC DATA SYSTEMS CORPORATION'S MOTION TO COMPEL (1) DATABASES AND OTHER DOCUMENTS RELATED TO THE ANALYTICAL CHARTS STEINGRABER PROVIDED TO EDS; AND (2) IDENTIFICATION OF FACT WITNESSES - Page 2

001177.01381:780053.01

> As you are also aware, Mr. Steingraber sent a letter to Gil Friedlander dated April 2, 2003, in which he stated that he has finished his analysis.... Mr. Steingraber also attached certain charts, apparently culled from this analysis, that support his contentions contained in the April 2 letter. It appears from this letter and its attachments that Mr. Steingraber has had a comprehensive forensic analysis done of his expense reports at ATK/EDS from January 1, 1995 until August 5, 2002. Please supply, in electronic and searchable form ... any database or other documents related to the analysis Mr. Steingraber mentioned in his April 2 letter to Mr. Friedlander.

(Exhibit 2). Steingraber's attorneys rejected this request and, instead, raised a meritless work product objection:

> ...with regard to your request for "any database or other documents" prepared by our forensic accountant, we decline to produce these materials at this time. The materials were prepared by a consulting expert who has been retained in preparation for trial. Mr. Steingraber has not reviewed the database or any of the consulting expert's file materials. The charts attached to Mr. Steingraber's letter were prepared by McDermott, Will & Emery based on our consulting expert's work. Mr. Steingraber verified the information in the charts by reviewing the actual timesheets and expense records that have been produced in this case.

(Exhibit 3, May 7, 2003 letter).

EDS submits that had Steingraber not given the charts to EDS, this sort of objection may have passed muster. Now that Steingraber has produced them (and relied on them as part of his admissions and claims), however, EDS has a right to challenge the accuracy of both by inspecting any databases upon which the charts were based as well as other related documents. It does not matter that *Steingraber* has not reviewed the "database" or any of the "consulting expert's file materials" which underlie the charts, nor that *Steingraber's lawyers* tried to interject some separation between these supporting materials and the charts by "basing" them on their "expert's work."

PLAINTIFF ELECTRONIC DATA SYSTEMS CORPORATION'S MOTION TO COMPEL (1) DATABASES AND OTHER DOCUMENTS RELATED TO THE ANALYTICAL CHARTS STEINGRABER PROVIDED TO EDS; AND (2) IDENTIFICATION OF FACT WITNESSES - Page 3

001177.01381:780053.01

The right to examine materials underlying a chart which purports to summarize voluminous materials is absolute. FEDERAL EVIDENCE RULE 1006 ("The originals, or duplicates [of contents of information presented in the form of a chart], shall be made available for examination or copying, or both, by other parties at [a] reasonable time and place."). *See also, e.g., United States v. Bishop*, 264 F.3d 535, 548 (5th Cir. 2001), *cert. denied*, 535 U.S. 1016 (2002) (approving instruction that summary testimony and charts "are no better than the testimony and the documents upon which they are based, and are not themselves independent evidence"). One cannot just point to a summary chart and claim that it supports his position – he must make the supporting materials available so its accuracy can be verified. This rule is premised upon common sense.

Here, Steingraber provided two charts to EDS upon which he bases admissions and factual contentions. Obviously, Steingraber is planning to advance an argument at trial that his systematic double-dipping actually constituted mere "mistakes" and that he has now repaid EDS for the resulting mistaken overpayments. (*See* Exhibit 1). Steingraber, however, is refusing to provide EDS access to the underlying materials based on an unfounded work product assertion. If Steingraber wanted to protect this information, he should not have given the charts to EDS, nor should he be relying on those charts in an effort to prove his principal defense in this case. Now that he has done so, he must turn over the underlying database. He cannot be permitted to use the charts as swords while shielding the underlying materials from disclosure based on a privilege claim. *See, e.g., Atari Corp. v. Sega of America*, 161 F.R.D. 417, 420 (N.D. Cal. 1994) (where plaintiff voluntarily gave defendant a copy of an interview tape of their expert witness who was, at that point, only hired in anticipation of litigation and not yet designated to testify at

PLAINTIFF ELECTRONIC DATA SYSTEMS CORPORATION'S MOTION TO COMPEL (1) DATABASES AND OTHER DOCUMENTS RELATED TO THE ANALYTICAL CHARTS STEINGRABER PROVIDED TO EDS; AND (2) IDENTIFICATION OF FACT WITNESSES  - Page 4

001177.01381:780053.01

trial, plaintiff was required to produce to defendant "all documents relied upon in forming the opinions stated in [the video statement]."). Critically, the *Atari* court compelled the disclosure of the information despite the plaintiff's assertion that the requested materials were protected by the attorney-client and work product doctrine because of the expert's status as a non-testifying expert, because "[a]ny voluntary disclosure inconsistent with the confidential nature of the work product privilege waives the privilege." *Id.*, at 420.

Furthermore, even if the charts are entirely based upon documentation that has already been produced or is otherwise in the possession of EDS, any related "database," "consulting expert's file materials," and other documents are still subject to discovery. *See, e.g., Williams v. E.I. du Pont de Nemours & Co.*, 119 F.R.D. 648, 651 (W.D. Ky. 1987) (defendant sought a copy of the computerized database compiled by plaintiff from information produced by defendant; plaintiff refused in light of the fact that defendant was in the possession of the underlying information; the court held that defendant could discover, at its expense, among other things, the "computerized database in the form of the computer storage disk," the "codebooks," and "all documents used in encoding the database [except some copyrighted information].").[1]

Moreover, the extent to which Steingraber or his lawyers have referred to the "database," "file materials," or related documents is not relevant to the discoverability of this underlying information. Rather, the fact that his attorneys relied on this information in preparing the two charts that Steingraber provided to EDS only serves to expand the scope of what fairly should be

---

[1] The only meaningful distinction between this case and *Williams* is that in that case, the EEOC had designated the expert that created its summary materials as a trial witness, where, as here, Steingraber has represented that it will make at least some of the information underlying the charts available *if and when* he chooses to use the forensic expert at trial. (*See* Exhibit 3). This may have been a well-founded position had he not disclosed the charts. Now that he has done so, however, he is required to turn over the underlying materials. *See Atari v. Sega*, 161 F.R.D. 417.

PLAINTIFF ELECTRONIC DATA SYSTEMS CORPORATION'S MOTION TO COMPEL (1) DATABASES AND OTHER DOCUMENTS RELATED TO THE ANALYTICAL CHARTS STEINGRABER PROVIDED TO EDS; AND (2) IDENTIFICATION OF FACT WITNESSES - Page 5

001177.01381:780053.01

considered as supporting materials. Thus, EDS requests that this Court order Steingraber to produce any materials related to the charts, including "database[s]," "expert file materials," and anything used by his attorneys to prepare the charts. EDS should also be given access to this information in paper form, and, to the extent possible, in electronic and searchable form (just as Steingraber has demanded throughout the course of this case). *See, e.g.,* (Exhibit 4, letter from Steingraber's lawyer, David F. Wentzel, dated January 15, 2003, stating "[w]e also request that you promptly produce all relevant electronic data compilations in their native formats with all active and non-active data included." Defendant's Motion to Compel, filed February 6, 2003, generally, and at 15 (prayer for relief in which Steingraber requests "copies of all emails and other electronic files in their native electronic formats"). *See also, e.g.,* this Court's Order of March 24, 2003 at ¶ 1 ("Electronic documents shall be produced not only in TIF format but in mirror image format as well.").

EDS cannot re-create the information contained in the requested charts because EDS does not have access to much of the information independent of accessing it through Steingraber. Although EDS does not concede that the information Steingraber is attempting to withhold from disclosure is his attorneys' work product, even if it is, EDS is entitled to it under Rule 26(b)(3) and cases interpreting that Rule. In this case, Steingraber attempts to assert a defense based on his review of records he refuses to produce to EDS. Therefore, to prosecute its claims, EDS is entitled to copies of these documents. Such a need is clearly substantial and is fundamental to EDS's ability to prosecute its case and defend against Steingraber's counterclaims.

Second, EDS has been unable to obtain many of the documents from a source other than Steingraber, despite its best efforts to do so. An undue burden therefore exists as required by

PLAINTIFF ELECTRONIC DATA SYSTEMS CORPORATION'S MOTION TO COMPEL (1) DATABASES AND OTHER DOCUMENTS RELATED TO THE ANALYTICAL CHARTS STEINGRABER PROVIDED TO EDS; AND (2) IDENTIFICATION OF FACT WITNESSES - Page 6

001177.01381:780053.01

Rule 26(b)(3) to justify production by Steingraber of these underlying documents.  In this case,

EDS subpoenaed the documents presumably relied upon by Steingraber's attorneys, but the

entities in possession of these documents – primarily entities on whose boards of directors

Steingraber sat or still sits – are hiding behind the Hague Convention and refusing to produce the

documents to EDS.  The burden – both in terms of expense and time – on EDS to battle these

foreign entities to obtain documents already in Steingraber's possession is great, and could be

ameliorated by Steingraber producing the documents to which EDS is entitled.

### B.   Steingraber Should Be Compelled to Identify the Fact Witnesses His Attorneys Have Interviewed

In his Initial Rule 26 Disclosures, Steingraber listed 59 separate "persons with knowledge

of relevant facts." (Exhibit 5).  Though Steingraber identified 59 names, the potential universe

of individuals he has identified as having factual knowledge is much broader.  Within his Initial

Disclosures, Steingraber has included broad categories of individuals such as "other current and

former ATK officers who served in various capacities and ATK's former board of directors,

board of management, and vice president performance evaluation and compensation committee"

and "other members of ATK's and EDS' accounting departments between 1995 and 2002." (*See*

*id.* at ¶¶ 29, 30, 32, 40-44).  As a result, the actual number of individuals who Steingraber claims

have factual knowledge regarding this matter cannot specifically be determined, but is easily in

the hundreds.  Furthermore, Steingraber's descriptions of the knowledge of the individuals listed

in his Initial Disclosures is limited and often repetitive.

Faced with this extensive list of potential witnesses and mindful that it is limited to 15

fact witness depositions in this case, in its First Set of Interrogatories to Steingraber, EDS simply

asked Steingraber to identify individuals who had been interviewed concerning the relevant

PLAINTIFF ELECTRONIC DATA SYSTEMS CORPORATION'S MOTION TO COMPEL (1) DATABASES AND OTHER DOCUMENTS RELATED TO THE ANALYTICAL CHARTS STEINGRABER PROVIDED TO EDS; AND (2) IDENTIFICATION OF FACT WITNESSES - Page 7

001177.01381:780053.01

allegations in this case.  The interrogatory did not request counsel to reveal the content of the interview nor any other information that would require disclosure of Steingraber's attorneys' mental processes or legal theories.   To this generically stated interrogatory, Steingraber interposed a work product objection:

> 11.   Identify all individuals whom you or your representatives (including, but not limited to, your attorneys) have interviewed and/or obtained a statement (either written, oral, taped, or otherwise preserved) concerning the subject matter of EDS' Amended Complaint or your Answer and Counterclaim. For each individual identified, provide the dates the interview was conducted and/or statement provided, and the form of the statement (i.e., oral, written, video or audiotape, etc.).
>
> **ANSWER:**   Defendant objects to this interrogatory as vague, overly broad, unduly burdensome and seeking information not relevant to the subject matter of the litigation nor reasonably calculated to lead to the discovery of relevant, admissible evidence.  Defendant further objects to this interrogatory to the extent that it seeks information about the identity of witnesses interviewed by defendant's counsel (as opposed to the identity of witnesses who have information relevant to the parties' claims and defenses) on the ground that such information is protected from disclosure by the work product doctrine.

(Exhibit 6, Defendant's Objections and Revised Answers to Interrogatories, No. 11).

As the names and addresses of witnesses interviewed by counsel who have knowledge of the facts alleged in the pleadings is not protected from disclosure by the work product doctrine, EDS requested that Steingraber amend his answer to Interrogatory No. 11 by providing the identification of individuals who had been interviewed.  (Exhibit 7, February 17, 2003 letter). After requesting time to review this issue, Steingraber responded that he continued to object to identifying witnesses interviewed by his counsel on the ground that the information was protected by the work product doctrine.   (Exhibit 8, February 28, 2003 letter).   This issue remains unresolved.

PLAINTIFF ELECTRONIC DATA SYSTEMS CORPORATION'S MOTION TO COMPEL (1) DATABASES AND OTHER DOCUMENTS RELATED TO THE ANALYTICAL CHARTS STEINGRABER PROVIDED TO EDS; AND (2) IDENTIFICATION OF FACT WITNESSES - Page 8

001177.01381:780053.01

As explained below, federal courts routinely compel identification of witnesses interviewed by counsel as not constituting protected attorney work product.  Particularly where, as in this case, Steingraber has specifically identified well over four times as many individuals as could ever be deposed under the Court's Amended Discovery Order, courts will not require a party to vainly search for a needle in a haystack in order to determine the identity of fact witnesses who may provide information relevant to the allegations in a lawsuit.  Accordingly, EDS respectfully submits that it is entitled to a full and complete answer to Interrogatory No. 11 of its First Set of Interrogatories.

The party asserting protection of the attorney work product doctrine has the burden of establishing that the doctrine applies.  *Smith v. WNA Carthage, L.L.C,.* 200 F.R.D. 576, 577 (E.D. Tex. 2001).  Since the United States Supreme Court rendered its seminal decision in *Hickman v. Taylor*, 329 U.S. 495 (1947), it has been black letter law that the work product doctrine does not protect against the discovery of relevant non-privileged facts notwithstanding that they are contained in protected documents or were learned by counsel.  *Id.* at 501, 507.

The identity of individuals with factual knowledge concerning the allegations involved in a lawsuit is not the type of information protected by the attorney work product doctrine.  As the court in *In re Theragenics Corp. Securities Litigation*, 205 F.R.D. 631, 634 (N.D. Ga. 2002), succinctly stated:  "Numerous courts since *Hickman v. Taylor*, ... have recognized that names and addresses of witnesses interviewed by counsel who have knowledge of facts alleged in the complaint are not protected from disclosure by the work product doctrine."  *See also Id.* at 634 ("Before and after the amendment to Rule 26, 'the courts consistently held that the work product concept furnished no shield against discovery, by interrogatories or by deposition, of facts that

PLAINTIFF ELECTRONIC DATA SYSTEMS CORPORATION'S MOTION TO COMPEL (1) DATABASES AND OTHER DOCUMENTS RELATED TO THE ANALYTICAL CHARTS STEINGRABER PROVIDED TO EDS; AND (2) IDENTIFICATION OF FACT WITNESSES - Page 9

001177.01381:780053.01

the adverse party's lawyer has learned, or the persons from whom he or she learned such facts, or the existence or nonexistence of documents, even though the documents themselves may not be subject to discovery.'"); *In re Aetna, Inc. Securities Litigation*, 1999 U.S. Dist. LEXIS 8038 at *6 (E.D. Pa. June 2, 1999) ("[T]he Court finds that the names and addresses of individuals interviewed by Plaintiffs' counsel are not protected by the attorney work product doctrine under *Hickman v. Taylor* ... At most, such information has minimal work product content."); *Castle v. Sangamo Westin, Inc.*, 744 F.2d 1464, 1467 (11th Cir. 1984) ("In particular, we note that appellee had failed to take even the fundamental first step in discovery of requesting the names and addresses of the witnesses the appellants had already interviewed. *The law is clear that such information is subject to discovery.*") (emphasis added).

In declining to afford work product protection to a simple list of individuals with factual knowledge who have been interviewed by the opposing counsel, federal courts have reasoned that the identification of these fact witnesses does not encroach upon counsel's mental processes or legal theories.  Those courts also have recognized the potential waste of resources that would occur if work product was extended to the identity of individuals who have been interviewed when a party identifies numerous potential fact witnesses, noting that the discovery process would be subverted if a party must engage in expensive and time-consuming efforts to discover relevant factual information.

For instance, in *In re Theragenics Corp. Securities Litigation*, the plaintiffs in a securities fraud case identified 54 employees they contended had knowledge of the facts underlying the plaintiffs' claims.  When asked in another interrogatory to "'[i]dentify all former employees of Indigo Medical, Inc. and Amersham with whom you or your representatives communicated, as

PLAINTIFF ELECTRONIC DATA SYSTEMS CORPORATION'S MOTION TO COMPEL (1) DATABASES AND OTHER DOCUMENTS RELATED TO THE ANALYTICAL CHARTS STEINGRABER PROVIDED TO EDS; AND (2) IDENTIFICATION OF FACT WITNESSES - Page 10

001177.01381:780053.01

alleged in the preamble paragraph of the Second Amended Complaint, in investigating the allegations of plaintiffs' initial complaint, First Amended Complaint, or Second Amended Complaint'," the plaintiffs refused on the basis of attorney work product protection. After comprehensively reviewing the law, the court granted the defendants' motion to compel identification of the specific individuals. The court concluded that "[t]he disclosure sought here will provide minimal, if any, disclosure of an attorney's thought processes. It will not reveal Plaintiffs' litigation strategy. Certainly, the work product doctrine was not devised to protect all work by attorneys in the global sense." 205 F.R.D. at 636.

An identical result was reached in *In re Aetna, Inc. Securities Litigation*, 1999 U.S. Dist. LEXIS 8038 (E.D. Pa. June 2, 1999). In that case, the court compelled the plaintiffs to respond to an interrogatory requesting the name and address of each of the persons interviewed in connection with the allegations set forth in various paragraphs of the second amended complaint. The court explained that it did not find that the plaintiffs' counsel's legal theories or mental impressions would be compromised by providing an identification of individuals who they interviewed:

> The fact that those individuals described in the Second Amended Complaint were interviewed by Plaintiffs' counsel during its investigation in anticipation of litigation does not change the Court's conclusion. The Supreme Court in *Hickman v. Taylor* made clear that the work product doctrine protects against the disclosure of an attorney's mental processes and legal opinions; the critical question is the extent to which the information disclosed is an attorney's thought processes. The disclosure of the names and addresses of those individuals interviewed by Plaintiffs' counsel will not reveal the 'mental impressions, conclusions, opinions, or legal theories of [Plaintiffs'] attorneys.'"

*Id.* at *9 and 10.

PLAINTIFF ELECTRONIC DATA SYSTEMS CORPORATION'S MOTION TO COMPEL (1) DATABASES AND OTHER DOCUMENTS RELATED TO THE ANALYTICAL CHARTS STEINGRABER PROVIDED TO EDS; AND (2) IDENTIFICATION OF FACT WITNESSES - Page 11

001177.01381:780053.01

The court further explained that it would not require defendants to expend considerable resources in order to identify and discover information from the individuals who had relevant factual information of the allegations in the complaint. As the court explained:

> In this case, Plaintiffs have named approximately 750 individuals who have knowledge pertaining to the allegations in PP 54-61 and 64-69 of the Second Amended Complaint. ... Without the Court's intervention, Defendants would be forced to engage in a time-consuming and expensive effort to ferret out the veritable needle in the haystack. In order to identify those persons with information about Plaintiffs' allegations, Defendants would have to interview or depose each and every one of the 750 individuals named by Plaintiffs. The Court will not allow the discovery process to be subverted in this way. The Court finds that Defendants have made a sufficient showing of need; the qualified protection over the names and addresses of those interviewed by Plaintiffs' counsel must yield to the need of the Defendants to get on with discovery in this case.

*Id.* at *11-12.

Likewise, in *United States v. Amerada Hess Corp.*, 619 F.2d 980 (3rd Cir. 1980), the Third Circuit compelled production of a list of individuals who had been interviewed by Amerada's outside counsel as part of an internal investigation of possible improper foreign payments. Finding that none of the "classic dangers to which the *Hickman v. Taylor* rule is addressed" were present, the court held that providing the list to the government was warranted. As the court explained:

> In this case, the list of interviewees is just that, a list. It does not directly or indirectly reveal the mental processes of the [outside counsel]. It furnishes no information as to the content of any statement. There is no realistic possibility that its production will convert any member of [the outside law] firm from advocate to witness. None of the policy reasons for protection of work product, other than the fact of its initial compilation by [the outside law firm], applies.

619 F.2d at 987-988.

This case presents an equally compelling need to enforce the well-established principle that the identity of individuals interviewed by counsel who have knowledge of facts alleged in a

PLAINTIFF ELECTRONIC DATA SYSTEMS CORPORATION'S MOTION TO COMPEL (1) DATABASES AND OTHER DOCUMENTS RELATED TO THE ANALYTICAL CHARTS STEINGRABER PROVIDED TO EDS; AND (2) IDENTIFICATION OF FACT WITNESSES - Page 12

001177.01381:780053.01

lawsuit are not protected from disclosure by the work product doctrine.  Steingraber's Initial Disclosures list 59 persons with knowledge of relevant facts to the claims and defenses asserted by the parties.  In addition, Steingraber provides unspecified categories of individuals such as (a) other current and former ATK officers who served in various capacities on ATK's former board of directors, board of management, and vice president performance evaluation and compensation committee; (b) members of ATK's communications department in 1995; (c) other members of ATK's and EDS' accounting departments between 1995 and 2002; (d) members of EDS' legal department who participated in the investigation of Steingraber; (e) members of EDS' public relations and marketing departments; (f) members of EDS' accounting department; and (g) members of ATK's and EDS' human resources departments.  (*See* Exhibit 5 Steingraber's First Amended Rule 26(a) Initial Disclosures ¶¶ 29, 30, 32, 40-44).  In this case, EDS is limited to 15 fact witness depositions.  EDS is not required to "engage in a time-consuming and expensive effort to ferret out the veritable needle in a haystack" in order to identify individuals who purportedly can support Steingraber's counterclaim.  Provision of a simple list of individuals interviewed will promote efficient discovery and provide EDS with the opportunity to depose individuals with factual knowledge that may, or may not, support Steingraber's allegations.  *In re Aetna, Inc. Securities Litigation*, 1999 U.S. Dist LEXIS 8038 at *12.

Further, providing EDS a list of individuals who have been interviewed does not remotely encroach upon Steingraber's counsel's mental processes and legal theories.  EDS' interrogatory does not seek the content of the interview, but rather an identification of who was interviewed, when, and by what means.  Such a list tells EDS nothing about Steingraber's case –

PLAINTIFF ELECTRONIC DATA SYSTEMS CORPORATION'S MOTION TO COMPEL (1) DATABASES AND OTHER DOCUMENTS RELATED TO THE ANALYTICAL CHARTS STEINGRABER PROVIDED TO EDS; AND (2) IDENTIFICATION OF FACT WITNESSES  - Page 13

001177.01381:780053.01

that will be left to EDS' attorneys to determine through depositions at which Steingraber's counsel will be present.

Indeed, the fact that providing a list will not implicate any of the concerns upon which the work product doctrine was founded is implicitly confirmed by this Court's Amended Discovery Order, which requires that the parties to exchange "any witness statements described in Tex. R. Civ. P. 192.3(h)" without a formal discovery request.  (Amended Discovery Order at Section 1, Paragraph (g)).  EDS respectfully submits that this aspect of the Amended Discovery Order suggests that the identity of potential fact witnesses who can provide statements or testimony is not to be hidden from the opposing party.  On the contrary, if Steingraber is obligated to provide such witness statements, no work product protection should apply to the mere identity of individuals who have been interviewed regardless of whether they provided a written statement.  As the information sought by EDS is not protected by the work product doctrine and, in any event, EDS has shown a substantial need for the information to conduct appropriate discovery within the confines of the Amended Discovery Order, Steingraber should be compelled to provide that information.

PLAINTIFF ELECTRONIC DATA SYSTEMS CORPORATION'S MOTION TO COMPEL (1) DATABASES AND OTHER DOCUMENTS RELATED TO THE ANALYTICAL CHARTS STEINGRABER PROVIDED TO EDS; AND (2) IDENTIFICATION OF FACT WITNESSES - Page 14

001177.01381:780053.01

## CONCLUSION

For the foregoing reasons, EDS respectfully requests that this Court order Steingraber to produce the information described herein as set forth in the attached *Proposed Order* filed herewith.

Respectfully submitted,

Weston C. Loegering
State Bar No. 12481550

HUGHES & LUCE, L.L.P.
Bank One Center
1717 Main Street, Suite 2800
Dallas, Texas 75201
Telephone:  (214) 939-5500
Facsimile:  (214) 939-6100
E-Mail:  loegerw@hughesluce.com


Martin T. Wymer
Stephen C. Sutton
DUVIN, CAHN & HUTTON
Erieview Tower - 20th Floor
1301 East Ninth Street
Cleveland, OH  44114
Telephone:  (216) 696-7600
Facsimile:  (216) 696-2038


ATTORNEYS FOR ELECTRONIC DATA
SYSTEMS CORPORATION

## CERTIFICATE OF CONFERENCE

In accordance with LR CV-7(h), counsel for EDS certifies that counsel has conferred with opposing counsel in a good faith attempt to resolve the subject matter of this motion without Court intervention.  Copies of the correspondence between counsel have been attached to this motion.  No informal resolution was achieved, and Defendant Steingraber opposes this motion.

_____
Weston C. Loegering

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing *Plaintiff Electronic Data Systems Corporation's Motion to Compel (1) Databases and Other Documents Related to the Analytical Charts Defendant Provided to EDS; and (2) Identification of Fact Witnesses* was served upon all counsel of record by Certified Mail, Return Receipt Requested on this _22 nd_ day of May, 2003.

_____
Weston C. Loegering

PLAINTIFF ELECTRONIC DATA SYSTEMS CORPORATION'S MOTION TO COMPEL (1) DATABASES AND OTHER DOCUMENTS RELATED TO THE ANALYTICAL CHARTS STEINGRABER PROVIDED TO EDS; AND (2) IDENTIFICATION OF FACT WITNESSES - Page 16

001177.01381:780053.01

**EXHIBIT 1**

Fred G. Steingraber
615 Warwick Road
Kenilworth, IL 60043

---

April 2, 2003

**VIA FEDERAL EXPRESS**

Gil Friedlander
General Counsel
Electronic Data Systems Corporation
5400 Legacy Drive
Plano, TX 75024-3199

Re:   EDS v. Steingraber

Dear Gil:

We have finished our analysis of my expense reports to ATK and the outside boards on which I served between January 1, 1995 and August 5, 2002.  Our analysis involved a comprehensive review and comparison of all 11,000-plus expense items listed on the expense reports, not simply the items that are the subject of EDS' allegations in the Amended Complaint. Accordingly, we have identified errors beyond those listed in the Amended Complaint.

To begin with, the enclosed chart itemizes all of the errors that resulted in the double-billing of expenses.  These errors total $27,741.30.  Next, we have identified 132 mathematical errors on the expense reports.  These errors resulted in me under-requesting $12,521.42 during the time period in question.  According to the direct deposit records we have received from EDS, which show the amounts that ATK represents to have deposited in my bank account, it appears that ATK's auditors corrected many, but not all, of these mistakes.  Taking all of these corrections into account, I have still under-requested $4,535.04 in reimbursement due to mathematical errors.  The enclosed charts itemize the mathematical errors and the corrections made by ATK's auditors.  Finally, ATK is in possession of an airline ticket that I paid for relating to a trip that was canceled.  The amount of the ticket is $947.24 and the ticket number is 0167102804663 (United Airlines).

Gil Friedlander
April 2, 2003
Page 2


Subtracting the net amount of under-reimbursement due to the mathematical errors and the cost of the airline ticket from the total amount of the double-billing errors, I have determined that I owe ATK/EDS $22,259.02 as follows:

$28,895
- $4,535.04
$24,359.96

- $    947.24
$22,259.02

I have enclosed a check in this amount.  Please note that we have not received all of the direct deposit payment records from ATK.  If those records show that the ATK auditors corrected additional mathematical errors resulting in a lower net total of under-charges, I will write a second check to make up the difference.

Please feel free to call my attorneys if you have any questions about the enclosed calculations or the documentation on which they are based.

Sincerely,

Frederick G. Steingraber

FGS/ls
Enc.
cc:     Steven P. Handler

CHI99 4087944-1.060540.0011

## LISTING OF ERRORS RESULTING IN DOUBLE BILLING

| Company Name | Expense Date | Expense Type | Amount Submitted to the BOD | Amount Double Charged |
|---|---|---|---|---|
| Continental AG | 5/27/1999 | Limo/Taxi | 54.40 | 54.40 |
| Continental AG | 6/2/1999 | Hotel | 349.17 | 349.17 |
| Continental AG | 6/2/1999 | Limo/Taxi | 56.50 | 56.50 |
| Continental AG | 10/5/1999 | Air Fare | 8,439.35 | 8,439.35 |
| Continental AG | 10/5/1999 | Limo/Taxi | 135.35 | 132.35 |
| Continental AG | 12/9/1999 | Air Fare | 4,169.90 | 4,161.90 |
| Continental AG | 12/11/1999 | Air Fare | 2,499.75 | 2,499.75 |
| Continental AG | 5/10/2000 | Limo/Taxi | 71.40 | 71.40 |
| Continental AG | 5/11/2000 | Air Fare | 2,532.50 | 2,532.50 |
| Continental AG | 5/17/2000 | Air Fare | 1,351.00 | 1,351.00 |
| Continental AG | 5/22/2000 | Air Fare | 1,332.40 | 1,332.40 |
| Continental AG | 5/22/2000 | Hotel | 115.00 | 115.00 |
| Continental AG | 5/22/2000 | Limo/Taxi | 59.00 | 58.50 |
| Continental AG | 12/8/2000 | Hotel | 332.94 | 332.94 |
| **Continental AG Total** | | | **$21,498.66** | **$21,487.16** |
| Maytag | 8/12/1998 | Limo/Taxi | 57.50 | 57.50 |
| Maytag | 8/13/1998 | Limo/Taxi | 70.00 | 70.00 |
| Maytag | 11/12/1998 | Limo/Taxi | 76.50 | 76.50 |
| Maytag | 2/11/1999 | Limo/Taxi | 14.00 | 14.00 |
| Maytag | 5/12/1999 | Limo/Taxi | 110.90 | 110.90 |
| Maytag | 8/10/1999 | Air Fare | 1,351.85 | 1,351.85 |
| Maytag | 8/11/1999 | Limo/Taxi | 50.00 | 50.00 |
| Maytag | 8/9/2000 | Limo/Taxi | 86.50 | 85.00 |
| Maytag | 9/11/2000 | Parking/Mileage | 44.50 | 35.00 |
| Maytag | 11/8/2000 | Limo/Taxi | 28.00 | 28.00 |
| Maytag | 2/7/2001 | Parking/Toll/Mileage | 38.00 | 29.00 |
| Maytag | 2/8/2001 | Parking/Toll/Mileage | 38.00 | 29.00 |
| **Maytag Total** | | | **$1,965.75** | **$1,936.75** |
| Southeastern Thrift & Bank Trust | 2/15/1996 | Air Fare | 949.55 | 949.55 |
| Southeastern Thrift & Bank Trust | 2/15/1996 | Car Rental | 275.56 | 275.56 |
| Southeastern Thrift & Bank Trust | 2/15/1996 | Meals/Tips | 119.15 | 117.20 |
| Southeastern Thrift & Bank Trust | 1/26/1998 | Limo/Taxi | 141.00 | 141.00 |
| Southeastern Thrift & Bank Trust | 1/26/1998 | Limo/Taxi | 69.00 | 69.00 |
| Southeastern Thrift & Bank Trust | 7/20/1998 | Air Fare | 578.50 | 578.50 |
| Southeastern Thrift & Bank Trust | 7/20/1998 | Limo/Taxi | 85.02 | 85.02 |
| Southeastern Thrift & Bank Trust | 7/27/1999 | Hotel | 551.86 | 551.86 |
| Southeastern Thrift & Bank Trust | 7/27/1999 | Air Fare | 1,359.57 | 1,359.57 |
| Southeastern Thrift & Bank Trust | 2/1/2001 | Hotel | 190.13 | 190.13 |
| **Southeastern Thrift & Bank Trust Total** | | | **$4,319.34** | **$4,317.39** |

## Math Errors Identified on Expense Reports
### Includes Summary of Over (Under) Payment

| Year | Week Ending | Expense Date | Description | Count # Errors | Auto Rental | S/B Auto Rental | Air Fare | S/B Air Fare | Hotel | S/B Hotel | Surface Trans | S/B Surface Trans | Other | S/B Other | Total Expense | S/B Total Expense | Difference | Telephone | S/B Telephone | Parking/Tolls | S/B Parking/Tolls | Mileage Expense | S/b Mileage Expense | Meals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1995 | 1/7/95 | | Error in Total 1361.84 s/b 1366.14 | | | | | | | | | | | | 1,361.84 | 1,366.14 | (4.30) | | | | | | | |
| 1995 | 1/21/95 | | Error in Total Surface Transportation | | | | | | | | | | | | 975.54 | 976.54 | (1.00) | | | | | | | |
| 1995 | 1/28/95 | | Did not transfer $18 to the Total Expense column-but th | 2 | | | | | | | | | | | 185.50 | 195.50 | (10.00) | | | | | | | |
| 1995 | 2/25/95 | 2/23/95 | Did not write in the total expense amount | | | | | | | | 45.50 | 55.50 | | | 101.00 | 101.00 | 0.00 | | | | | | | |
| 1995 | 3/11/95 | | Appears to have entered 127.92 twice | 2 | | | | | | | 18.00 | | | | 264.90 | 264.90 | 127.92 | | | | | | | |
| 1995 | 3/18/95 | | Error in Total Surface Transportation/Error in Total | 2 | | | | | | | 516.70 | 566.70 | | | 1,626.81 | 1,498.89 | 127.92 | | | | | | | |
| 1995 | 4/8/95 | | Did not write in the total expense amount | 2 | | | | | | | | | | | 1,445.17 | 1,495.17 | (50.00) | | | | | | | |
| 1995 | 4/15/95 | | Did not write in the total expense amount | | | | | | | | | | | | 53.50 | 53.50 | (53.50) | | | | | | | |
| 1995 | 4/22/95 | | Error in Total Surface Transportation | 2 | | | | | | | 331.45 | 323.45 | 331.45 | | 1,608.05 | 1,602.05 | 6.00 | | | | | | | |
| 1995 | 5/20/95 | 5/26/95 | Error in the Total Expense column-but th | | | | | | | | | | | | 1,602.05 | 1,602.05 | 0.00 | | | | | | | |
| 1995 | 5/27/95 | | Did not include $19 in the Total Exp. column-but th | 2 | | | | | | | | | | | 6,269.15 | 6,269.15 | 0.00 | | | | | | | |
| 1995 | 6/10/95 | | Did not include 388.64+378.56 in the total | 2 | | | | | | | | | | | 2,378.64 | 2,378.64 | (731.20) | | | | | | | |
| 1995 | 6/24/95 | | Did not include $175 from "Other" in total/Did not write i | 2 | | | | | | | | | 841.54 | 1,588.74 | 1,647.44 | 1,647.44 | (731.20) | | | | | | | |
| 1995 | 7/22/95 | | Did not write in the total expense amount | | | | | | | | | | 56.55 | 231.55 | 231.55 | 231.55 | (231.55) | | | | | | | |
| 1995 | 8/5/95 | | Bad Copy | | | | | | | | | | | | 128.40 | 128.40 | (128.40) | | | | | | | |
| 1995 | 8/31/95 | | Error in Total | x | | | | | | | | | | | | | | | | | | | | |
| 1995 | 10/28/95 | 10/4/95 | Did not transfer $74.02 to the Total Expense column-bu | | | | | | | | | | | | 779.56 | 779.14 | 0.42 | | | | | | | |
| 1996 | 3/9/96 | 3/6/96 | Sundry total Breakdown appears a total of 5601.46 s/b 3601.46 | 1 | | | | | | | 712.63 | 712.71 | | | 4,106.71 | 4,106.71 | 0.00 | | | | | | | |
| 1996 | 1/6/96 | 1/4/96 | Total surface 331.95 s/b 332.15 | 1 | | | | | | | | | | | 331.95 | 332.15 | 24.18 | | | | | | | |
| 1996 | 1/13/96 | | Error sundry listed as 114.46 s/b 124.46. | 2 | | | | | | | | | 114.46 | | 2,534.14 | 2,534.14 | (0.20) | | | | | | | |
| 1996 | 1/24/96 | 1/27/96 | total error | 2 | | | | | | | | | 67.50 | 67.50 | 67.50 | 57.50 | 0.00 | | | | | | | |
| 1996 | 2/9/96 | 2/10/96 | Total equals 7630.78 transposed numbers in Total Exp | | | | | | | | | | | | 8,224.75 | 8,224.75 | 0.00 | | | | | | | |
| 1996 | 2/23/96 | | Total and Surface trans errors | 2 | | | | | | | 75.00 | 85.00 | | | 237.00 | 247.00 | (10.00) | | | | | | | |
| 1996 | 3/27/96 | | Total and Surface trans errors | 2 | | | | | | | | | | | 237.00 | 247.00 | (10.00) | | | | | | | |
| 1996 | 4/27/96 | | Total and Surface trans errors | 2 | | | | | 1,100.21 | 1,108.15 | | | | | 11,816.26 | 11,816.20 | 0.06 | | | | | | | |
| 1996 | 5/25/96 | 5/25/96 | Total Expense and Hotel errors. | 2 | | | | | | | | | | | 255.90 | 255.97 | (0.07) | | | | | | | |
| 1996 | 6/1/96 | 6/1/96 | Total 255.90 s/b 255.97. | | | | | | | | | | | | 8,529.28 | 8,529.78 | (0.50) | | | | | | | |
| 1996 | 6/8/96 | 6/8/96 | Other total 106.65 s/b 107.15 | 5 | | | | | | | | | 196.65 | 107.15 | 2,489.96 | 2,489.96 | 0.00 | | | | | | | |
| 1996 | 6/15/96 | 6/15/96 | transposed 956.85 as 965.85 and carry forward number entered wrong | 1 | | | | | | | | | | | 520.82 | 520.82 | 0.00 | | | | | | | |
| 1996 | 7/27/96 | 7/23/96 | Did not transfer $23.75 to Total Expense total $ is right | 1 | | | | | | | | | | | 126.00 | 126.00 | (126.00) | | | | | | | |
| 1996 | 8/3/96 | | Did not write in the total expense amount and total exp. | 2 | | | | | | | | | 341.82 | | 744.72 | 749.72 | (5.00) | | | | | | | |
| 1996 | 10/5/96 | 10/5/96 | Failed to write 308.86 on sundries error total sundry | 2 | | | | | 1,450.12 | 1,449.12 | 864.02 | 881.84 | 346.82 | | 8,674.76 | 8,673.76 | 1.00 | | | | | | | |
| 1996 | 11/23/96 | | Total Expense and Hotel errors. | 2 | | | | | - | 431.25 | | | | | 3,313.74 | 3,331.05 | (17.31) | | | | | | | |
| 1998 | 11/7/98 | | Sheet is date 11/7/97 Total expense and total surface trans errors | | | | | | | | | | | | | | | | | | | | | |
| 1997 | 2/15/97 | | Bad Copy | | | | | | | | | | | | | | | | | | | | | |
| 1997 | 2/29/97 | | Total expense and Total surface errors | 2 | | | | | | | 183.50 | 186.00 | | | 282.74 | 283.24 | (0.50) | | | | | | | |
| 1997 | 3/15/97 | | Total Hotel error - Total is correct | 1 | | | | | - | - | | | | | 657.97 | 657.97 | 0.00 | | | | | | | |
| 1997 | 3/29/97 | | Total Surface Trans Error - Total is correct | 1 | | | | | | | - | 54.50 | | | 239.91 | 239.91 | 0.00 | | | | | | | |
| 1997 | 5/10/97 | | Total sundry 725.14 s/b 870.14 but used the correct total for final calculation | 1 | | | | | | | | | 723.14 | 870.14 | 1,034.14 | 1,034.14 | 0.00 | | | | | | | |
| 1997 | 5/17/97 | | Total expense and Total surface errors | 2 | | | | | | | 616.25 | 616.35 | | | 3,233.32 | 3,233.42 | (0.10) | | | | | | | |

| Year | Week Ending | Expense Date | Description | Count # Errors | Auto Rental | S/B Auto Rental | Air Fare | S/B Air Fare | Hotel | S/B Hotel | Surface Trans | S/B Surface Trans | Other | S/B Other | Total Expense | S/B Total Expense | Difference | Telephone | S/B Telephone | Parking/Tolls | S/B Parking/Tolls | Mileage Expense | S/b Mileage Expense | Meals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1997 | 5/24/97 | | Total Air Travel 12,399.35 s/b 12,399.05 - did not affect total | | | | 12,399.35 | 12,399.05 | | | | | | | 15,011.61 | 15,011.61 | 0.00 | | | | | | | |
| 1997 | 6/6/97 | | Total Hotel error - Total is correct | 1 | | | | | | 165.46 | | | | | 469.45 | 469.45 | 0.00 | | | | | | | |
| 1997 | 8/8/97 | | Bad Copy | | | | | | | | | | | | 873.50 | 758.00 | (10.00) | | | | | | | |
| 1997 | 8/22/97 | | Total and total error affect total | | | | | | | | 273.85 | 154.35 | 248.67 | 248.17 | 4,362.56 | 4,362.56 | 0.00 | | | | | | | |
| 1997 | 8/30/97 | | Did not write in the total expense amount | | | | | | | | 465.75 | 465.25 | 233.95 | 271.20 | 388.38 | 388.38 | 0.00 | | | | | | | |
| 1997 | 10/4/97 | | Did not write in the total expense amount | | | | | | | | | | | | 2,951.31 | 2,951.31 | 0.00 | | | | | | | |
| 1997 | 11/29/97 | | Steingraber claims $3005.18 was entered as total amount. $3015.18 was actually entered. | | | | | | | | | | | | 973.17 | 973.17 | 0.50 | | | | | | | |
| 1997 | 1/31/98 | | Did not write in the total expense amount | 1 | | | | | | | | | | | 1,802.77 | 1,802.77 | 1.00 | | | | | | | |
| 1998 | 2/21/98 | | Did not write in the total expense amount | | | | | | | | | | | | 1,948.82 | 1,949.20 | (0.38) | | | | | | | |
| 1998 | 4/4/98 | | Did not write in the total expense amount | | | | | | | | | | | | | | | | | | | | | |
| 1998 | 4/18/98 | | Did not write in the total expense amount | | | | | | | | | | | | | | | | | | | | | |
| 1998 | 4/27/98 | | On the expense breakdown amount is listed as 75.00 but the total comes to 85.00. Total due Steingraber should have been 247.00. | | | | | | | | | | | | | | | | | | | | | |
| 1998 | 5/29/98 | | Total expense and Surface trans errors | 2 | | | | | | | | | | | 5,631.08 | 5,631.08 | 0.00 | | | | | | | |
| 1998 | 9/12/98 | | Total Surface trans error | 2 | | | | | | | 190.00 | 189.51 | 508.39 | 507.39 | 2,983.65 | 2,983.90 | 0.00 | | | | | | | |
| 1998 | 11/25/98 | | Total expense error | | | | | | | | | | | | 388.38 | 388.38 | 169.69 | | | | | | | |
| 1998 | 11/25/98 | 11/10/98 | Total and total expense sundry errors | 2 | | | | | | | | | | | 279.29 | 279.29 | | | | | | | | |
| 1998 | 12/12/98 | | Total expense and total sundry errors | | | | | | | | | | | | 2,951.31 | 2,951.31 | 0.00 | | | | | | | |
| 1998 | 1/30/99 | 1/26/99 | Total expense and Total surface errors | 3 | | | | | | | | | | | 973.17 | 973.17 | 1.00 | | | | | | | |
| 1999 | 2/13/99 | | Total sundry error | 3 | | | | | | | | | 1,089.19 | 1,071.19 | 1,802.77 | 1,802.77 | 0.00 | | | | | | | |
| 1999 | 3/13/99 | | Total expense and total surface trans errors | 3 | | | | | | | 282.00 | 282.40 | | | 1,948.82 | 1,949.20 | (0.38) | | | | | | | |
| 1999 | 4/24/99 | | Total amount as well as all breakdown amounts are correct as shown =$5590.86 | | | | | | | | | | | | | | | | | | | | | |
| 1999 | 5/15/99 | | Bad Copy | x | | | | | | | | | | | | | | | | | | | | |
| 1999 | 6/5/99 | 6/4/99 | Total sundry | 1 | | | | | | | | | | | | | | | | | | | | |
| 1999 | 9/25/99 | 9/25/99 | Total expense error | 2 | | | | | | | | | 248.45 | 248.17 | 5,631.08 | 5,631.08 | 0.00 | | | | | | | |
| 1999 | 10/9/99 | 10/4/99 | Total expense error | 2 | | | | | | | | | 233.95 | 271.20 | 2,983.90 | 2,983.90 | 0.00 | | | | | | | |
| 1999 | 10/30/99 | | Total expense and total sundry errors. | 1 | | | | | | | | | | | 18,888.10 | 18,891.10 | (3.00) | | | | | | | |
| 1999 | 11/13/99 | | Bad Copy - No total at the bottom of the report | x | | | | | | | | | 197.02 | 197.62 | 394.27 | 394.37 | (0.10) | | | | | | | |
| 1999 | 1/8/00 | 1/8/00 | Total is correct - $1281.47 was only added once | 1 | | | | | | | | | | | 6,286.29 | 6,367.92 | (81.63) | | | | | | | |
| 2000 | 1/22/00 | | did not include in total expense report but added later by expense accountant. No receipt attached. | 3 | | | | | | | | | 650.29 | 851.54 | 9,854.98 | 10,056.23 | (201.23) | | | | | | | |
| 2000 | 1/28/00 | 1/26/00 | Total expense error | 1 | | | | | | | | | | | 3,494.55 | 3,492.55 | 2.00 | | | | | | | |
| 2000 | 4/8/00 | 4/8/00 | Total expense and total surface trans errors | 2 | | | | | | | 962.77 | 917.17 | | | 928.96 | 933.36 | 45.60 | | | | | | | |
| 2000 | 6/10/00 | | Total expense error | 1 | | | | | 609.94 | 664.94 | | | | | 2,763.63 | 2,771.63 | 0.00 | | | | | | | |
| 2000 | 7/29/00 | | Total sundry error | 2 | | | | | | | | | 528.78 | 538.78 | 3,107.77 | 3,107.77 | 0.00 | | | | | | | |
| 2000 | 8/11/00 | 8/11/00 | Total expense and total air fare errors | 1 | | | | | | | 50.50 | 51.00 | | | 684.23 | 684.73 | 0.00 | | | | | | | |
| 2000 | 9/1/00 | | Did not write in total air fare errors | 6 | | | | 4,921.60 | 5,718.35 | | | | | | 5,342.20 | 5,753.20 | (411.00) | | | | | | | |
| 2000 | 10/14/00 | | Total trans error and did not write in the total expense amount | 2 | | | | | | | | | | | 406.20 | 406.20 | 0.00 | | | | | | | |
| 2000 | 10/28/00 | | Did not write in the total expense amount | 1 | | | | | | | | | | | 384.94 | 384.94 | 0.00 | | | | | | | |
| 2001 | 1/2/01 | | Did not write in the total expense amount | 1 | | | | | | | | | | | 3,020.33 | 3,020.33 | 0.00 | | | | | | | |
| 2001 | 1/15/01 | | Total expense and air fare errors | 2 | | | | | | | | | | | 13,240.70 | 13,240.70 | (2.00) | | | | | | | |
| 2001 | 2/10/01 | 3/17/01 | Did not write in the total expense amount | 2 | | | | | | | | 387.30 | | | 7,432.21 | 7,432.21 | (39.00) | | | | | | | 39.00 |
| 2001 | 3/17/01 | 4/7/01 | Total trans error and did not write in the total expense amount | 2 | | | | | | | | | | | 194.72 | 194.72 | (26.01) | | | | | | | 26.01 |
| 2001 | 4/7/01 | 4/4/01 | Total trans error and did not write in the total expense amount | 1 | | | | | | | | | | | 3,015.53 | 3,015.53 | (77.00) | | | | | | | 77.00 |
| 2001 | 4/21/01 | | Did not write in the total expense amount | | | | | | | | | | | | 39.00 | 77.00 | (87.00) | | | | | | | 87.00 |
| 2001 | 4/28/01 | | Did not write in the total expense amount | | | | | | | | | | | | | 87.00 | (387.30) | | | | | | | |
| 2001 | 5/12/01 | | Did not write in the total expense amount | 1 | | | | | | | | | | | 387.30 | 387.30 | | | | | | | | 222.51 |

| Year | Week Ending | Expense Date | Description | Count # Errors | Auto Rental | S/B Auto Rental | Air Fare | S/B Air Fare | Hotel | S/B Hotel | Surface Trans | S/B Surface Trans | Other | S/B Other | Total Expense | S/B Total Expense | Difference | Telephone | S/B Telephone | Parking/Tolls | S/B Parking/Tolls | Mileage Expense | S/b Mileage Expense | Meals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2001 | 6/9/01 | | Did not write in the total expense amount | 1 | | | | | | | | | | | - | 193.40 | (193.40) | | | | | | | |
| 2001 | 7/21/01 | | Did not write in the total expense amount | 1 | | | | | | | | | | | - | 367.90 | (367.90) | | | | | | | |
| 2001 | 11/24/01 | | Did not write in the total expense amount | 1 | | | | | | | | | | | - | 54.00 | (54.00) | | | | | | | |
| 2001 | 12/8/01 | | Did not enter the correct total amount | 1 | | | | | | | | | | | 52.00 | 76.00 | (24.00) | | | | | | | |
| 2001 | 12/15/01 | | Did not write in the total expense amount | 1 | | | | | | | | | | | - | 24.00 | (24.00) | | | | | | | |
| 2002 | 3/16/02 | | Did not write in the total expense amount | 1 | | | | | | | | | | | - | 21.00 | (21.00) | | | | | | | |
| 2002 | 3/16/02 | | Did not write in the total expense amount | 1 | | | | | | | | | | | - | 12.00 | (12.00) | | | | | | | |
| 2002 | 4/27/02 | | Did not write in the total expense amount | 1 | | | | | | | | | | | - | 35.00 | (35.00) | | | | | | | |
| 2002 | 5/4/02 | | Did not write in the total expense amount | | | | | | | | | | | | | | | | | | | | | |
| 2002 | 5/10/02 | | Did not write in the total expense amount | | | | | | | | | | | | | | | | | | | | | |
| 2002 | 8/3/02 | 5/11/02 | No error | | | | | | | | | | | | | | | | | | | | | |
| 2002 | 8/3/02 | 8/3/02 | Total expense error/5.10 instead of 510.00 (corrected) | 1 | | | | | | | | | | | 510.00 | 510.00 | 0.00 | | | | | | | |
| 2002 | 6/15/02 | 6/11/02 | Total expense and Total surface errors | 3 | | | | | | | 54.00 | 96.00 | | | 54.00 | 96.00 | (42.00) | | | | | | | |
| | | | **TOTAL:** | 132 | | | | | | | | | | | | | (4,535.64) | | | | | | | |

**EXHIBIT 2**

LAW OFFICES OF

# DUVIN, CAHN & HUTTON

A LEGAL PROFESSIONAL ASSOCIATION

**MARTIN T. WYMER**
MWYMER@DUVIN.COM

ERIEVIEW TOWER
20TH FLOOR
1301 EAST NINTH STREET
CLEVELAND, OHIO 44114
216/696-7600
FACSIMILE: 216/696-2035
WEB ADDRESS:
WWW.DUVINLAW.COM

26711 NORTHWESTERN HIGHWAY
SUITE 200
SOUTHFIELD, MICHIGAN 48034
248/945-1977
FACSIMILE: 248/945-1162

April 25, 2003

VIA FACSIMILE AND
REGULAR U.S. MAIL

David F. Wentzel, Esq.
McDermott, Will & Emery
227 West Monroe Street
Chicago, IL 60606-5096

      Re:    Electronic Data Systems Corporation v. Steingraber

Dear Mr. Wentzel:

      In your letter dated April 21, 2003, you stated that Mr. Steingraber is available to be deposed on June 5, 2003. Accordingly, attached is a Re-Notice of Deposition scheduling Mr. Steingraber's deposition for that date, commencing at 9:00 a.m. at the offices of McDermott, Will & Emery in Chicago (we presume that holding the deposition at your Chicago offices would be both convenient and acceptable for Mr. Steingraber; of course, if you prefer to hold the deposition at another location, please let me know and we will make the necessary alternative arrangements).

      Please note that we also would like to schedule the deposition of Lew Rosenbloom. Ideally, we would like to take his deposition at your offices on Friday, June 6, 2003, commencing at 10:00 a.m. (I expect that Mr. Rosenbloom's deposition likely will not take the entire day). Please let me know if Mr. Rosenbloom is available to be deposed on that date. If not, please provide us with alternative dates when Mr. Rosenbloom may be available to be deposed during the weeks of May 19, May 26, and June 9.

      With respect to the Steingraber deposition, I would like to request that you provide certain information to us well in advance of that deposition. Specifically, in Interrogatory No. 2 of EDS' First Set of Interrogatories we served upon you back in January, EDS requested that Mr. Steingraber:

      Identify every financial institution (including, but not limited to, banks or brokerages) at which you maintain or have maintained an account, including for each financial institution, the account numbers for any and all accounts that you maintain or have maintained since January 1, 1994.

In response, you objected on the basis that the Interrogatory was "overly broad, calculated to harass, and seeking information not relevant to the subject matter of the litigation nor reasonably calculated

David F. Wentzel, Esq.                    - 2 -                    April 25, 2003

to lead to the discovery of relevant, admissible evidence." Though we did not press the issue at the time, we believe that it is necessary for EDS to obtain this information to adequately prepare for Mr. Steingraber's deposition. As you know, Mr. Steingraber is contending in this case (as part of his expected showing of damages) that if he would have received the shares of EDS stock that would have vested a few weeks after his termination, he would have immediately sold those shares and thereby avoided the impact of the dramatic drop in EDS' stock price that occurred weeks later. Obviously, documents showing Mr. Steingraber's history of buying and selling EDS stock will be quite relevant to this issue. Moreover, Mr. Steingraber's general aptitude as an investor for being able to foresee dramatic downturns in a company's stock price and therefore sell the stock shortly before such a downturn took place (or alternatively, his ability to sell stocks at or near their high) is certainly relevant to Mr. Steingraber's damages theory in this case. Therefore, we believe that documents related to all stock transactions Mr. Steingraber made in the past nine years are certainly relevant and discoverable in this case.

We also do not believe such a request is overly broad or burdensome. In order to assess Mr. Steingraber's stock trading history, one needs to review that history over a period of years. In addition, it would not be burdensome for Mr. Steingraber to provide the requested information. He may either request the information from the brokerages he has utilized and submit it to us well in advance of the deposition, or he can promptly provide us with the names of the brokerages, account numbers, and an appropriate release so that we can subpoena the information ourselves in advance of the deposition.

We also believe that the requested information concerning Mr. Steingraber's accounts at other types of financial institutions (such as banks) is certainly relevant in this case, inasmuch as it will help us to piece together whether or not Mr. Steingraber received reimbursements from third party entities for expenses that were reimbursed by EDS/ATK. In this regard, to narrow the scope of this request (and the corresponding burden on Mr. Steingraber), we will modify this aspect of the Interrogatory to simply request the names of financial institutions (and the appropriate account numbers) for any institution that Mr. Steingraber used to deposit expense reimbursement checks from EDS, ATK, or any of the third party entities mentioned in EDS' First Amended Complaint. Again, Mr. Steingraber can either provide the names of the institutions with the corresponding account numbers so that we can subpoena the required information, or he can obtain the information himself and supply it to us in advance of the deposition.

As you are also aware, Mr. Steingraber sent a letter to Gil Friedlander dated April 2, 2003, in which he stated that he has finished his analysis involving "a comprehensive review and comparison of all 11,000-plus expense items listed on the expense reports, not simply the items that are the subject of EDS' allegations in the Amended Complaint." Mr. Steingraber also attached certain charts, apparently culled from this analysis, that support his contentions contained in the April 2 letter. It appears from this letter and its attachments that Mr. Steingraber has had a comprehensive forensic analysis done of his expense reports at ATK/EDS from January 1, 1995 until August 5, 2002. Please supply, in electronic and searchable form (as you have defined it in your various pieces

David F. Wentzel, Esq.                    - 3 -                         April 25, 2003

of correspondence over the last few months), any database or other documents related to the analysis Mr. Steingraber mentioned in his April 2 letter to Mr. Friedlander. I trust that you will not take the position that this database is not discoverable, particularly in light of the positions your office has taken throughout the course of this case. In any event, please let me know whether this information will be forthcoming in advance of Mr. Steingraber's deposition.

We also request that Mr. Steingraber supplement his earlier responses to EDS' First Request for Production of Documents by producing his tax returns (with all supporting schedules) for the year 2002.

Finally, inasmuch as Mr. Steingraber's deposition is roughly six weeks away, I would appreciate it if you would let us know by the end of next week whether or not you will agree to produce the information we request in this letter so that we can seek the assistance of the Court in sufficient time to obtain the information to utilize at Mr. Steingraber's deposition.

I look forward to hearing from you at your convenience. In the meantime, I remain

Very truly yours,

Martin T. Wymer

MTW/cck
Enclosure
cc:     Clyde M. Siebman, Esq.
        Weston C. Loegering, Esq.
        Electronic Data Systems Corporation

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| ELECTRONIC DATA SYSTEMS CORPORATION, | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 4:02CV225 |
| FRED G. STEINGRABER, | § § § | |
| Defendant. | § § | |

---

## RE-NOTICE OF DEPOSITION OF DEFENDANT FRED G. STEINGRABER

---

Weston C. Loegering
State Bar No. 12481550

HUGHES & LUCE, L.L.P.
1717 Main Street, Suite 2800
Dallas, TX  75201
Telephone:     (214) 939-5500
Facsimile:      (214) 939-6100


Martin T. Wymer (OH 0004004)
DUVIN, CAHN & HUTTON
Erieview Tower - 20th Floor
1301 East Ninth Street
Cleveland, OH  44114
Telephone:     (216) 696-7600
Facsimile:      (216) 696-2038

ATTORNEYS FOR ELECTRONIC DATA
SYSTEMS CORPORATION

Please take notice that pursuant to Rule 30 of the Federal Rules of Civil Procedure, Plaintiff, Electronic Data Systems Corporation, will take the deposition of Defendant, Fred G. Steingraber, on June 5, 2003, at 9:00 a.m., at the offices of McDermott, Will & Emery, 227 West Monroe Street, Chicago, Illinois 60606-5096.  Such deposition will continue from day to day until completed and will be conducted pursuant to the Federal Rules of Civil Procedure.  This deposition will be recorded by stenographic, sound, and visual means before a court reporter duly authorized to administer oaths and take testimony.

Respectfully submitted,

Martin T. Wymer
Stephen C. Sutton
DUVIN, CAHN & HUTTON
Erieview Tower - 20th Floor
1301 East Ninth Street
Cleveland, OH 44114
Telephone: (216) 696-7600
Facsimile: (216) 696-2038

Weston C. Loegering
State Bar No. 12481550

HUGHES & LUCE, L.L.P.
Bank One Center
1717 Main Street, Suite 2800
Dallas, Texas 75201
Telephone: (214) 939-5500
Facsimile: (214) 939-6100
E-Mail: loegerw@hughesluce.com

ATTORNEYS FOR ELECTRONIC DATA
SYSTEMS CORPORATION

**RE-NOTICE OF DEPOSITION OF DEFENDANT - Page 1**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served on all counsel of record via facsimile and regular United States mail on this the 25th day of April, 2003.

MARTIN T. WYMER

**RE-NOTICE OF DEPOSITION OF DEFENDANT - Page 2**

**EXHIBIT 3**

*A Partnership Including*
*Professional Corporati*
227 West Monroe Street
Chicago, IL 60606-5096
312-372-2000
Facsimile 312-984-7700
http://www.mwe.com

Boston
Chicago
Los Angeles
Miami
Moscow
Newport Beach
New York
St. Petersburg
Silicon Valley
Vilnius
Washington, D.C.

**David F. Wentzel**
Attorney at Law
dwentzel@mwe.com
312-984-7789

## McDERMOTT, WILL & EMERY

May 7, 2003

**VIA FACSIMILE**

Martin T. Wymer, Esq.
Duvin, Cahn & Hutton
Erieview Tower, 20th Floor
1301 East Ninth Street
Cleveland, OH 44114

      Re:    EDS v. Steingraber

Dear Marty:

      This letter responds to your letter of April 25, 2003. With regard to your request for documents relating to Mr. Steingraber's stock transactions, please note that EDS already has all records relating to any transactions involving EDS stock, since these transactions were managed by EDS. Additionally, Mr. Steingraber has already produced copies of all documents in his possession relating to transactions involving EDS stock. (*See* FGS 05201-FGS 05244).

      With respect to transactions involving other kinds of stock, we will obtain whatever records are available from Mr. Steingraber's broker and produce them, although we do not know whether records exist going back nine years. Also, please note that pursuant to Rule 26(a)(1)(A) of the Federal Rules of Civil Procedure and the Amended Discovery Order, we hereby designate Mr. Steingraber's broker, Tom Cleary from Bank of America in Chicago, as a witness with discoverable information that Mr. Steingraber may use to support his claim for damages in this case. Specifically, Mr. Cleary is knowledgeable about the history of Mr. Steingraber's stock transactions and the directive he received from Mr. Steingraber to liquidate any EDS stock as soon as possible after vesting. We expect to be able to produce relevant documents from Mr. Cleary's file by the end of this week or early next week.

      With regard to your request for Mr. Steingraber's banking records, we do not understand your position concerning the relevance of these materials. EDS has already subpoenaed records relating to Mr. Steingraber's expense reimbursement requests from the outside boards on which he sits. Those records show the dates on which Mr. Steingraber submitted reimbursement requests to the boards, the amounts requested, and the dates and amounts of payments made by

Martin T. Wymer, Esq.
Duvin, Cahn & Hutton
May 7, 2003
Page 2

the boards. Mr. Steingraber does not contest that he deposited the checks he received from the outside boards into his account. What additional information can possibly be gleaned from reviewing all of Mr. Steingraber's bank statements for the past nine years? Please explain how this information is probative of any contested issue in this case.

Finally, with regard to your request for "any database or other documents" prepared by our forensic accountant, we decline to produce these materials at this time. The materials were prepared by a consulting expert who has been retained in preparation for trial. Mr. Steingraber has not reviewed the database or any of the consulting expert's file materials. The charts attached to Mr. Steingraber's letter were prepared by McDermott, Will & Emery based on our consulting expert's work. Mr. Steingraber verified the information in the charts by reviewing the actual timesheets and expense records that have been produced in this case. If, at the appropriate time in the future, we decide to designate the forensic accountant as a testifying expert, we will comply fully with the disclosure requirements of Rule 26 and the Amended Discovery Order in this case.

If you have any questions or would like to discuss any of these issues further, please do not hesitate to call me.

Very truly yours,

David F. Wentzel

DFW/ls
cc:     Clyde Siebman (via fax)
        Weston Loegering (via fax)
        Lewis Rosenbloom

**EXHIBIT 4**

*A Partnership Including*
*Professional Corporations*
227 West Monroe Street
Chicago, IL 60606-5096
312-372-2000
Facsimile 312-984-7700
http://www.mwe.com

**David F. Wentzel**
Attorney at Law
dwentzel@mwe.com
312-984-7789

Boston
Chicago
Los Angeles
Miami
Moscow
Newport Beach
New York
St. Petersburg
Silicon Valley
Vilnius
Washington, D.C.

# McDermott, Will & Emery

January 15, 2003

**VIA FAX**

Weston C. Loegering
Hughes & Luce, L.L.P.
Bank One Center
1717 Main Street, Suite 2800
Dallas, TX 75201

Re:   EDS v. Steingraber

Dear Wes:

I am writing to advise you of our objections to EDS' Rule 26 disclosures.  As you know, the Amended Discovery Order required EDS to have provided us with copies of all documents relevant to the pleaded claims and defenses, along with data compilations, electronic email, and tangible things.  The due date to supply these materials was January 6, 2003.  The term "data compilations," as used in the Federal Rules, specifically includes electronic files.  *See* Advisory Committee Notes to Fed. R. Civ. P. 34.  Although the Amended Discovery Order provides that "By written agreement of all parties, alternative forms of disclosure may be provided in lieu of paper copies," including exchanging images of documents on disks, you did not seek such agreement from us and we would not have agreed to the format provided.

Nevertheless, on January 6, 2002, you produced six CD's containing approximately 87,400 TIF files, each of which contains a single image of a single piece of paper.  On January 11, 2002, you produced 14 more CD's containing some 173,800 more TIF files.  These files are not electronically searchable and the one-page "index" that you provided with the CD's delivered on the 11th is useless from a practical standpoint.  Indeed, the index uses only seven words in total to describe all 260,000 pages of documents.  To even know what is on the CD's, we would have to view every single image on a computer screen.  If we spent only one minute viewing each image, it would take over 4300 hours to review them all.  Alternatively, we would have to print every single image, collate and organize the images into documents, and then review them, which would take even longer.

Even more distressing, it appears that while EDS compiled emails and other electronic files as part of its document sweep, it converted these files into a format that makes our review

Weston C. Loegering
Hughes & Luce, L.L.P.
January 15, 2003
Page 2

vastly more difficult. Instead of producing the electronic data compilations, EDS printed out
hard copies only of the "hard" content of the files, scanned them, and produced the scanned
(TIF) images. The result is that important meta-data contained in the electronic files has not
been produced – information that would identify whose computer particular documents came
from; when the documents were created, modified or deleted; the user name associated with each
of these tasks; what files and folders the documents were kept in; and other important data. The
TIF files also do not reveal embedded or hidden data, such as "bcc" fields for emails or whether
a Word document was revised or passed around for comments.

It would have been far simpler and cheaper for EDS to simply copy the electronic files
directly onto the CD's in their native formats. Furthermore, it appears from our initial glance at
some of the CD's that many of the images are of documents that are irrelevant to the claims and
defenses. In other words, we are confronted with a 260,000-page haystack in which we have to
manually search to find the relevant needles.

This is contrary to the letter and the spirit of the Federal Rules. The Rules require EDS
to produce the documents as they are kept in the usual course of business or to organize and label
them to correspond with the subject matters alleged in the pleadings. While Mr. Wymer stated to
me last week that EDS is operating under Rule 26 and is not required to comply with Rule 34,
the distinction is artificial. Rule 26, as implemented by the local district court rules and the
Amended Scheduling Order, is intended to provide for fuller, more expedited discovery, not to
diminish the parties' discovery obligations. Moreover, under Rule 26 as construed by local
practice, you are required to identify those documents that bear substantially on the claims and
defenses of the case. Such identification has not been made.

Mr. Wymer's letter of January 10, 2003 suggests that the options are for us to review all
260,000 of the images on the CD's and print out those documents that we believe are relevant, or
for EDS to copy and produce the entire set of 260,000 pages at our expense. In light of the
requirements of the local rules and the Amended Discovery Order discussed above, we do not
agree that these are the options. Instead, we request that EDS compile and produce paper copies
of all documents that bear substantially on the claims and defenses, and either label them to
correspond with the subject matters alleged in the pleadings or identify the Bates numbers of all
documents corresponding to particular subject matters. To avoid any confusion or
misunderstanding regarding the subject matters that Mr. Steingraber considers relevant to his
claims and defenses, we list those subject matters below. To the extent that EDS has not
produced documents relating to these subject matters, we request that you promptly supplement
your disclosures.

We also request that you promptly produce all relevant electronic data compilations in
their native formats with all active and non-active data included. For email, we request that you
produce the data in the same format used to create, receive and read the mail. For example, for
Microsoft Exchange and Outlook mail, the files should be produced in ".pst" or "personal
folders" files, or in an Exchange database. For Lotus Notes, mail should be produced in

Weston C. Loegering
Hughes & Luce, L.L.P.
January 15, 2003
Page 3

complete ".nsf" files.  Email and other electronic data compilations should be gathered not only
from the hard drives of the EDS and ATK employees identified in the parties' Rule 26
disclosures, but also from the servers that store data from those individuals, the backup tapes (for
the period between 1998 and the present) for those servers, and all removable or portable media,
including Blackberries and Palm Pilots (or other PDA's).  If EDS requires our technical
assistance in complying with this request, we are willing to provide it.

## Subjects Relevant to the Parties' Claims and Defenses

1.      ATK's and EDS' policies and procedures relating to disciplinary proceedings
against employees (including without limitation employee handbooks or manuals, and internally-
distributed memos, articles and newsletters)

2.      Internal and outside audits of expense reports submitted by EDS and ATK
executives between 1995 and the present.

3.      The "investigation" and termination of Steingraber (including without limitation
the complete files of Nick Linn, Storrow Gordon, Hughes & Luce, and other inside and outside
lawyers who participated in the investigation).

4.      The investigation referred to in ¶ 7 of the First Amended Complaint and the "tip"
referred to in ¶ 20 of the Counter-Answer.

5.      ATK's and EDS' policies and procedures relating to internal investigations.

6.      Documents and materials reviewed by those who conducted or participated in the
"investigation" of Steingraber.

7.      Expense reports (and attachments) submitted by Steingraber to ATK's accounting
department.

8.      The separate expense reports submitted to and reviewed by Dick Brown or his
representative(s).

9.      Payments made by ATK or EDS to reimburse Steingraber for expenses.

10.      Claims by or disputes with former ATK executives whose employment with ATK
and/or EDS ended after 1995, including without limitation the following: Brian Harrison,
William Best, Frank McGinnis, James Lagges, John Andrica, Larry Kohn, Paul Inglis, Thomas
Howard, Dale Marco, Avi Porat, Doug Aldrich, John Anderson and Marty Joyce.

Weston C. Loegering
Hughes & Luce, L.L.P.
January 15, 2003
Page 4

11.     Derivative or class-action suits against EDS alleging securities fraud, misconduct, misrepresentations, or other improprieties concerning accounting methodologies or practices, or the alleged manipulation of financial statements.

12.     Internal EDS investigations into possible securities fraud, misconduct, misrepresentations, or other improprieties concerning accounting methodologies or practices, or the alleged manipulation of financial statements.

13.     Incidents in which EDS or ATK advised any employee or officer, including without limitation Steingraber, of any alleged or suspected improprieties or misconduct, requested an explanation or clarification, or requested reimbursement or other remedial action between 1995 and the present.

14.     The investigation and termination of (or other disciplinary action against) any other ATK or EDS officer or executive for alleged Code of Conduct violations from 1995 to the present.

15.     All "legitimate business events" noted in ¶¶ 32 and 33 of the Counter-Answer between 1995 and the present, including: entertainment events at Mr. Brown's Moosehead Lake estate, sporting events, golf tournaments, auto races, horse races, symphony and theater outings, COMDEX conventions, "team building" and "morale boosting" events, and "retreats, trips and/or cruises," (including without limitation all expense reports for each such event, receipts, invitation and attendance lists, logs, menus, beverage lists and inventories, event schedules, passenger lists and other records reflecting transportation on EDS's company jet, videos, photos and posters memorializing or reflecting the events, and documentation related to authorization of the expenditures).

16.     Other business entertainment or "team building" events reimbursed or otherwise paid for by ATK or EDS, between 1995 and the present, in which the combined internal and out-of-pocket costs for the event exceeded $5,000, including without limitation the Hamburg ATK staff meeting in 2000, the Berlin ATK 35th anniversary meeting in 1999, and the new consultants welcoming parties, Christmas parties, and other parties hosted of organized by Dietmar Ostermann. (Your production should include all expense reports for each such event, receipts, invitation and attendance lists, logs, menus, beverage lists and inventories, event schedules, videos, photos and posters memorializing or reflecting the events, passenger lists and other records reflecting transportation on EDS's company jet, and documentation related to authorization of the expenditures).

17.     Expense reports and supporting documentation submitted for reimbursement by Dick Brown, Dietmar Ostermann, and Jim Daley.

Weston C. Loegering
Hughes & Luce, L.L.P.
January 15, 2003
Page 5

18.     The use of assets or property owned, paid for, or guaranteed by ATK or EDS by Dietmar Ostermann and any members of his family, including without limitation the property located at 142 Priory Lane, London and any personal loans or guarantees made by ATK or EDS.

19.     Analysis of or changes to the compensation, bonuses, benefits, and perquisites paid to ATK Vice Presidents and other senior executives since 1998.

20.     The termination or contemplated termination of any ATK Vice Presidents after 1998, including any analysis of the potential costs and benefits to EDS of terminating such individuals.

21.     Revenues generated between 1992 and the present from the companies represented by the non-ATK guests present at the January 7, 1995 dinner identified in the Complaint.

22.     Revenues generated from companies represented by the non-EDS or ATK guests present at "legitimate business entertainment" events held by EDS, as noted in the Counter-Answer.

23.     Property, both real and personal, owned or used by EDS for business entertainment purposes, including aircraft, motor vehicles, club memberships, and sporting event privileges or entertainment privileges (including but not limited to sky boxes, theater boxes, hospitality tents, season tickets and similar perquisites).

24.     Business entertainment events or dinners held by EDS executives in their homes or vacation homes or condos, including all receipts, expense reports, invitations, guest lists, menus, and documents relating to authorization or approval of such events.

25.     Mr. Steingraber's remuneration and/or benefits at ATK or EDS, whether or not actually accrued, and including without limitation any restricted securities, stock options, benefit plans, and/or deferred compensation agreements or plans (including all plan documents).

26.     "Target account hit lists" and similar documents as described by Mary White at page 33 of the transcript of her interview under oath attached to your Rule 26(a)(1) disclosures.

27.     EDS' internal audits of ATK between 1995 and the present.

28.     The costs, both internal and out-of-pocket, of EDS' investigation of Steingraber.

29.     The accounting practices and other matters discussed between Edward Schultz and EDS personnel or any outside auditors as noted on pages 74-77 of Shultz's interview under oath attached to your Rule 26(a)(1) disclosures, including without limitation, EDS's recognition of contingent revenue.

Weston C. Loegering
Hughes & Luce, L.L.P.
January 15, 2003
Page 6


30.     EDS' examination of and efforts to recover data from any computers used by Steingraber.

31.     Minutes of all ATK and EDS Board of Directors Meetings between 1995 and 2002.

32.     All communications between and among Steingraber, other ATK Vice Presidents or executives, Dick Brown, Jim Dalcy, Troy Todd, and other EDS executives regarding changes to ATK's structure, reporting relationships, governance, committees, compensation, leadership, accounting methods or practices, and performance goals or targets.

33.      All marketing and business entertainment budgets for ATK and EDS between 1995 and the present.

34.     ATK's and EDS' document retention policies.

35.     The retention, destruction, deletion, transfer or other disposition of documents, electronic data compilations, emails and other materials relating to the claims and defenses in this action.

36.     Communications between the individuals identified in the parties' Rule 26 disclosures and any other person or entity regarding any aspect of the claims or defenses asserted in this action, or the subject matters alleged in the pleadings.

37.     The personal calendars and schedules of Dick Brown, Troy Todd, Jim Daley, Storrow Gordon, Nick Linn, Jim Hendrix, and Kathleen Frawley for the years 1999 – 2002.

38.     Communications between any employee or representative (including retained consultants or experts) of ATK or EDS and any of Steingraber's former assistants relating to the claims and defenses asserted in this action, or the subject matters alleged in the pleadings.

39.     ATK's and EDS' policies and practices regarding retaining, destroying, recycling, or overwriting backup tapes for computer servers.

40.     Communications or instructions by ATK or EDS to its employees regarding the preservation or compilation of documents, electronic data compilations, email, and other materials relevant to the claims and defenses asserted in this action, or the subject matters alleged in the pleadings.

Additionally, we request that you produce any searchable databases or indices that EDS has created of the documents. In your voicemail message the other day, you stated that such a database had "not yet" been created, presumably meaning that the process was underway. Even

Weston C. Loegering
Hughes & Luce, L.L.P.
January 15, 2003
Page 7

if the database qualifies as work product, it must be produced because Mr. Steingraber has
substantial need of the information contained within the database in the preparation of his case
and is unable without undue hardship to obtain the substantial equivalent by other means. *See
e.g., State of Texas v. American Tobacco Company, et al.*, No. 5:96CV91, Order Compelling
Disclosure (November 13, 1996) (copy enclosed). If EDS intends to contest this position, please
advise as soon as possible so that we can begin the process of presenting this issue to the court.

      With regard to tangible items, we request that you produce any forensic images of
computer hard drives from workstations and laptops used by Mr. Steingraber, along with any
floppy disks, zip drives or other removable media. For purposes of this request, a "forensic
image" is a full bitstream of all data on the particular hard drive, including free space, slack
space, and other storage space on the media whether or not used for active files. If no forensic
images have been made, we request that you produce the hard drives themselves so that we can
create forensic images.

      Given the short discovery timetable in this case and the rapidly approaching mediation,
we request your prompt response to and compliance with these requests.

                  Sincerely,

                  David F. Wentzel

DFW/ls
cc:    Lewis Rosenbloom
       Steven Handler
       Clyde Siebman
       Martin Wymer

**EXHIBIT 5**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

ELECTRONIC DATA SYSTEMS )
CORPORATION, )
)
Plaintiff, )
)
v. )   Civil Action No. 4:02CV225
)
FRED G. STEINGRABER, )
)
Defendant. )

## DEFENDANT'S RULE 26(a) INITIAL DISCLOSURES

Defendant Fred G. Steingraber, by his undersigned attorneys, pursuant to Rule 26(a)(1)

of the Federal Rules of Civil Procedure and the Amended Discovery Order entered by the Court

on November 25, 2002, hereby submits his initial disclosures.

**A.      Names of the Parties**

The correct names of the parties are Electronic Data Systems Corporation, a Delaware

corporation, and Frederick G. Steingraber.

**B.      Potential Parties**

Defendant is unaware of any other potential parties at this time, but reserves the right to

join additional parties if his investigation or the discovery in this case reveals the existence of

valid claims against such parties.

**C.      Legal Claims and Theories**

**1.      Defenses to Plaintiff's Claims**

All of Plaintiff's asserted claims in this case are based on its allegations that

Defendant misappropriated corporate assets by knowingly submitting false and inappropriate

expense reports for items that were personal, duplicative or which did not constitute legitimate

ATK-related business expenses.  The alleged inappropriate expenses can generally be placed into three categories: (1) expenses for dinners that allegedly were personal in nature rather than business-related, (2) alleged duplicate expenses, and (3) expenses for goods and services that allegedly were personal in nature rather than business-related.  Defendant's legal and factual defenses to these allegations are as follows:

(a)     **Expenses for Allegedly "Personal" Dinners:**  Defendant asserts that the six business entertainment dinners and two ATK Vice President dinners during the period from 1995 to 2001 that Plaintiff claims were "inappropriate" were, in fact, ordinary, customary and legitimate business functions.  The January 7, 1995 dinner at Dawes Mansion in Chicago was attended by 84 CEO's and Chairmen of companies that accounted for significant business to ATK prior to January 7, 1995, and over $140 million in business between 1995 and 2001.  The dinner was planned with the assistance of ATK's Marketing Department.  A number of ATK Vice Presidents, including members of the Board of Directors and the CFO had knowledge of the dinner's purpose.  Furthermore, the dinner was specifically approved for reimbursement by ATK's CFO and Controller.

The other business entertainment dinners in question also were legitimate business events carried out by ATK's Chairman and CEO.  ATK derived significant benefit from these dinners in the form of consulting fees totaling over $60 million between 1995 and 2001 from the companies and organizations represented by the leaders who attended these dinners.  Defendant neither misrepresented nor hid information about these dinners when submitting his requests for reimbursement, and he routinely provided the names of the guests, their positions, and their organizational affiliations.  Consequently, the business judgment rule and the doctrines of waiver and estoppel preclude Plaintiff from asserting any claims relating to these dinners.  Furthermore,

-2-

the January 7, 1995 dinner occurred prior to EDS' acquisition of ATK and all of the dinners

occurred prior to the execution of March 2, 2001 employment agreement between the parties.

Consequently, as a matter of law, these events cannot serve as the basis for a breach of that

agreement.  Finally, Defendant asserts that the liquidated damages clause in the employment

agreement is unenforceable as a matter of law because the actual damages (if any) suffered by

Plaintiff are disproportionate to the amount of liquidated damages.

Furthermore, Plaintiff's and ATK's officers and other senior executives, including EDS'

CEO Richard "Dick" Brown, routinely incur and are reimbursed for business entertainment

expenses that far exceed in cost and extravagance the client dinners that Defendant hosted.

Additionally, many of the business entertainment functions that Plaintiff treats as ordinary

business expenses have social, quasi-social, sporting or cultural themes that are not business-

related.  Since Plaintiff itself engages in the same type of business entertainment activities, it

cannot complain that Defendant's business entertainment activities were inappropriate or a

breach of Defendant's contractual or fiduciary duties.

The factual basis for Defendant's contentions regarding the client dinners in question is

as follows: (1) all of the dinners in question were attended by corporate CEO's, Presidents and

other business leaders or by ATK Vice Presidents; (2) the names of every person who attended

these dinners are listed in Defendant's timesheets and attachments, or in the pleadings on file

herein, and their titles and organizational affiliations at the time of the dinners in question can be

independently verified; (3) the companies represented by the leaders who attended the dinners

account for over $200 million in consulting fees billed by ATK between 1995 and 2001; (4) one

of Defendant's most important responsibilities during his lengthy tenure as Chairman and CEO

of ATK was to develop relationships with top business leaders in the United States and around

the world; (5) Defendant routinely advised ATK's Board of Management, Board of Directors, and Performance Evaluation and Compensation Committee about his business development activities, including the hosting of special dinners, and the Board actively encouraged Defendant to host such functions; (6) Defendant's business development techniques were extremely successful, as evidenced by the fact that he assisted in generating hundreds of millions of dollars in business for ATK, which revenue might not have been realized had Chairman and CEO Fred Steingraber not hosted such dinners; (7) ATK and Plaintiff would not have incurred this revenue but for virtually all companies, including EDS, routinely and appropriately treat as business entertainment expenses the type of client dinners that Plaintiff claims were "inappropriate" for Defendant to expense; and (8) Dick Brown and other senior executives for Plaintiff entertain clients and prospective clients at dinners, parties, and functions that are far more extravagant than the client and ATK Vice President dinners that Defendant hosted.

Pursuant to the Amended Discovery Schedule entered by the Court, the foregoing is intended to be a general description of the factual bases for Defendant's contentions. Defendant reserves the right to identify additional facts as warranted by his investigation and the discovery in this case.

**(b)** **Duplicate expenses:** Defendant asserts that all of the incidents involving the alleged submission of duplicate expense reports over a seven and one-half year period reflect innocent mistakes made in submitting travel-related expenses for reimbursement. Consequently, such incidents cannot serve as the basis for Plaintiff's breach of contract, fraud, or breach of fiduciary duty claims because all of those claims require intentional conduct. Additionally, Defendant asserts that the vast majority of the alleged incidents occurred prior to the execution of the March 2, 2001 employment agreement between the parties and thus, as a matter of law,

-4-

cannot serve as the basis for a breach of that agreement.  Furthermore, even if duplicate expense requests were submitted, there was no material breach of the employment agreement because the amounts involved were *de minimis* and because Defendant's conduct was not knowing. Consequently, there was no "Cause" to terminate Defendant under the employment agreement. Finally, Defendant asserts that the liquidated damages clause in the employment agreement is unenforceable as a matter of law because the actual damages suffered by Plaintiff are disproportionate to the amount of liquidated damages.

The factual bases for Defendant's assertions are as follows: (1) Defendant was Chairman and CEO of ATK, the second largest high value added management consulting firm in the world, and traveled extensively around the globe throughout the year during the seven and one-half year period in question; (2) Defendant routinely worked more than 80 hours and sometimes 100 hours per week; (3) Defendant generated an enormous volume of work for his personal assistants, sometimes leading to mistakes; (4) when Defendant traveled to other cities to attend Board of Director meetings for outside companies, he frequently engaged in business development meetings with those same companies or other companies on behalf of ATK, making allocation of expenses difficult; (5) Defendant sometimes prepared his requests to the outside companies for expense reimbursement several weeks or months after the Board of Director meetings occurred, compounding the difficulty of allocating expenses; (6) Defendant's personal assistants often signed expense reimbursement requests using their own signature or Defendant's electronic signature; (7) Defendant even made mistakes in filling out his expense reports that resulted in his under-requesting more than $25,000 in reimbursable expenses during the same time period; (8) the amount of allegedly duplicative expenses over a seven and one-half year period are *de minimis* compared to the total amount of business-related travel expenses incurred by Defendant

during the relevant time frame, demonstrating a lack of intent; and (9) there is no pattern to the alleged incidents of duplicate expense reports, further demonstrating a lack of intent.

Pursuant to the Amended Discovery Schedule entered by the Court, the foregoing is intended to be a general description of the factual bases for Defendant's contentions. Defendant reserves the right to rely on or assert additional facts as warranted by his investigation and the discovery in this case.

### (c) Expenses for Other Allegedly Personal Goods and Services:

Defendant asserts that all of the other expenses that Plaintiff claims were personal in nature over the seven and one-half year period were also legitimate business expenses. For example, the two massages that Plaintiff claims were inappropriately expensed to ATK were obtained to relieve severe back pain that Defendant suffered while on an extended, transcontinental business trip for ATK. Additionally, the gift that Defendant purchased for ATK's outside accountant who was in the hospital undergoing surgery, the club dues that Defendant expensed to ATK, and the charitable contributions that Plaintiff claims were improper were in fact legitimate business expenses that were properly reimbursable to Defendant in accordance with ATK's practices. The trip to Duke University that Plaintiff complains about was a business trip to explore recruiting opportunities for ATK, to discuss a request by the university that Defendant serve on an international advisory board, and to attend a reception with a group of senior business leaders. Consequently, Defendant's request for reimbursement of each and all of these expenses were neither improper nor a breach of Defendant's contractual or fiduciary duties. Finally, the use of an ATK laptop computer by Defendant's son resulted from a lack of communication and an innocent mistake, and thus also was not wrongful or a breach of duty.

Furthermore, Defendant's requests for reimbursement for the alleged expenses during the seven and one-half year period in question cannot constitute a material breach of Defendant's employment agreement or material violation of the EDS Code of Conduct because the amounts involved were *de minimus* and because any violations of EDS or ATK policy were technical and unintentional. Consequently, there was no "Cause" to terminate Defendant under the employment agreement. In addition, Defendant asserts that all of the alleged incidents occurred prior to the execution of the March 2, 2001 employment agreement between the parties and thus, as a matter of law, cannot serve as the basis for a breach of that agreement. Finally, Defendant asserts that the liquidated damages clause in the employment agreement is unenforceable as a matter of law because the actual damages (if any) suffered by Plaintiff are disproportionate to the amount of liquidated damages.

The factual bases for Defendant's contentions regarding these expenses are as follows: (1) Defendant suffers from chronic back pain, which flared up while on an extended business trip to Southeast Asia, Australia and Korea, affecting Defendant's ability to conduct business; (2) ATK's practice during the period in question was to reimburse officers for annual club dues, including contributions made to the clubs' annual Christmas funds for employees; (3) the accountant for whom Defendant purchased a gift was ATK's corporate accountant, not Defendant's personal accountant; and (4) Defendant frequently engaged in professional recruiting and relationship-building/networking activities in his position as ATK's Chairman and CEO. Additional facts relevant to Defendant's contentions are set forth in his Answer and Affirmative Defenses to Plaintiff's First Amended Complaint.

Pursuant to the Amended Discovery Schedule entered by the Court, the foregoing is intended to be a general description of the factual bases for Defendant's contentions. Defendant

reserves the right to identify additional facts as warranted by his investigation and the discovery in this case.

## II.    Defendant's Counterclaim

Defendant contends that Plaintiff's allegations regarding duplicative and improper expense reporting are a ruse and a sham, and were trumped up to provide legal "cover" for Plaintiff to purportedly terminate Defendant's employment contract and thereby save millions of dollars in salary, bonuses, stock, options, perquisites and other benefits that it owed to Defendant, and to cause a forfeiture of Defendant's unvested restricted EDS stock and options. Defendant further contends that this ruse was conceived and executed as part of Plaintiff's larger scheme to artificially increase profits and prop up its sagging bottom line during a period of poor financial performance under Dick Brown's leadership.

Plaintiff's conduct was further motivated, in part, by personal animosity that Brown harbored toward Defendant because of Defendant's repeated objections to Brown's questionable business practices and efforts to change ATK's business model, culture, and entrepreneurial environment. Defendant contends that Plaintiff's actions were taken in bad faith and that its purported termination and repudiation of Defendant's employment agreement was a material breach of said agreement. Defendant seeks damages in the form of lost salary, stock ownership, dividends, options, perquisites, and other benefits that he would have received under the agreement.

The factual bases for Defendant's claims are detailed in Defendant's Answer and Affirmative Defenses, as well as in paragraphs 1-38 of Defendant's Counterclaim on file herein. Those facts are not repeated here. Defendant reserves the right to rely on or assert additional facts as warranted by his investigation and the discovery in this case.

**D.** **Persons With Knowledge of Relevant Facts**

The following persons have or are believed to have knowledge of facts relevant to the claims and defenses asserted by the parties. The names, addresses and phone numbers for these individuals are not available to Defendant, but are either known or available to Plaintiff.

1.    Mary White, ATK. Ms. White was Defendant's personal assistant and should be knowledgeable about the preparation and submission of Defendant's expense reports, as well as Defendant's travel patterns and work habits. Ms. White also might be knowledgeable about aspects of Plaintiff's purported "investigation" of Defendant.

2.    Gay Borchardt, ATK. Ms. Borchardt was Defendant's personal assistant and should be knowledgeable about the preparation and submission of Defendant's expense reports, as well as Defendant's travel patterns and work habits. Ms. Borchardt also might be knowledgeable about aspects of Plaintiff's purported "investigation" of Defendant.

3.    Pat Morosky. Ms. Morosky was Defendant's personal assistant and should be knowledgeable about the preparation and submission of Defendant's expense reports, as well as Defendant's travel patterns and work habits. Ms. Morosky also might be knowledgeable about aspects of Plaintiff's purported "investigation" of Defendant.

4.    Erin Manghera. Ms. Manghera was Defendant's personal assistant and should be knowledgeable about the preparation and submission of Defendant's expense reports, Defendant's travel patterns and work habits, and the facts relating to the laptop computer that was furnished to Defendant's son. Ms. Manghera also might be knowledgeable about aspects of Plaintiff's purported "investigation" of Defendant.

5.    Mary Ellen Ramacotti. Ms. Ramacotti was Defendant's personal assistant and should be knowledgeable about the preparation and submission of Defendant's expense reports,

as well as Defendant's travel patterns and work habits. Ms. Ramacotti also might be knowledgeable about aspects of Plaintiff's purported "investigation" of Defendant.

6.      Robin Hiestand. Ms. Hiestand was Defendant's personal assistant and should be knowledgeable about the preparation and submission of Defendant's expense reports, as well as Defendant's travel patterns and work habits. Ms. Hiestand also might be knowledgeable about aspects of Plaintiff's purported "investigation" of Defendant.

7.      Cheryl Wegmann. Ms. Wegman was Defendant's personal assistant and should be knowledgeable about the preparation and submission of Defendant's expense reports, as well as Defendant's travel patterns and work habits. Ms. Wegman also might be knowledgeable about aspects of Plaintiff's purported "investigation" of Defendant.

8.      Mary Bell Molina. Ms. Molina was Defendant's personal assistant and should be knowledgeable about the preparation and submission of Defendant's expense reports, as well as Defendant's travel patterns and work habits. Ms. Molina also might be knowledgeable about aspects of Plaintiff's purported "investigation" of Defendant.

9.      David Asper.  Mr. Asper is an ATK Vice President who sat on its Board of Directors and Board of Management. He is knowledgeable about differences between EDS' and ATK's business models, policies and practices relating to expense reimbursement; Defendant's travel patterns and work habits; Defendant's customary business development activities; how EDS' reneged on commitments made by the prior leadership at the time of the ATK acquisition; EDS' calculation of the "exit" costs of highly compensated ATK executives if those individuals were terminated for reasons other than "Cause;" the targeting of senior ATK executives for termination by Brown and other top EDS managers; EDS' efforts to artificially boost profits by slashing the compensation and benefits paid to senior ATK executives; Defendant's repeated

-10-

cautions to Brown and other EDS managers regarding their questionable business decisions; and business entertainment expenses incurred by EDS.

10.     Pat Byrne. Mr. Byrne is the former Chief Operating Officer of ATK and a current Vice President.  He is knowledgeable about the differences between EDS' and ATK's business models, policies and practices relating to expense reimbursement; Defendant's travel patterns and work habits; Defendant's customary business development activities; how EDS' reneged on commitments made by the prior leadership at the time of the ATK acquisition; EDS' calculation of the "exit" costs of highly compensated ATK executives if those individuals were terminated for reasons other than "Cause;" the targeting of senior ATK executives for termination by Brown and other top EDS managers; EDS' efforts to artificially boost profits by slashing the compensation and benefits paid to senior ATK executives; Defendant's repeated cautions to Brown and other EDS managers regarding their questionable business decisions; and business entertainment expenses incurred by EDS.

11.     John Egan. Mr. Egan is Executive Vice President of ATK.  He is knowledgeable about differences between EDS' and ATK's business models, policies and practices relating to expense reimbursement; Defendant's travel patterns and work habits; Defendant's customary business development activities; how EDS' reneged on commitments made by the prior leadership at the time of the ATK acquisition; Defendant's repeated cautions to Brown and other EDS managers regarding their questionable business decisions; and business entertainment expenses incurred by ATK and EDS executives.

12.     William Seithel. Mr. Seithel is the former H.R. Director of ATK.  He is knowledgeable about differences between ATK's and EDS' business models, policies and practices relating to human resource matters, including EDS' calculation of the "exit" costs of

highly compensated ATK executives if those individuals were terminated for reasons other than "Cause;" how EDS' reneged on commitments made by the prior leadership at the time of the ATK acquisition; the targeting of senior ATK executives for termination by Brown and other top EDS managers; issues relating to age discrimination; and ATK's and EDS' policies and procedures for conducting investigations and disciplinary proceedings.

13.    Earl Hammond. Mr. Hammond is ATK's Controller. He is knowledgeable about EDS' calculation of the "exit" costs of highly compensated ATK executives if those individuals were terminated for reasons other than "Cause;" and how EDS' reneged on commitments made by the prior leadership at the time of the ATK acquisition.

14.    Brian Harrison. Mr. Harrison is a former ATK senior executive. He is knowledgeable about differences between EDS' and ATK's business models, policies and practices relating to expense reimbursement; how EDS' reneged on commitments made by the prior leadership at the time of the ATK acquisition; the targeting of senior ATK executives for termination by Brown and other top EDS managers; and EDS' efforts to artificially boost profits by slashing the compensation and benefits paid to senior ATK executives.

15.    William Best. Mr. Best is a former ATK senior executive. He is knowledgeable about differences between EDS' and ATK's business models, policies and practices relating to expense reimbursement; how EDS' reneged on commitments made by the prior leadership at the time of the ATK acquisition; and the targeting of senior ATK executives for termination by Brown and other top EDS managers.

16.    Frank McGinnis. Mr. McGinnis is a former ATK senior executive. He is knowledgeable about differences between EDS' and ATK's business models, policies and practices relating to expense reimbursement; how EDS' reneged on commitments made by the

prior leadership at the time of the ATK acquisition; and the targeting of senior ATK executives for termination by Brown and other top EDS managers.

      17.     James Lagges. Mr. Lagges is a former ATK senior executive. He is knowledgeable about differences between EDS' and ATK's business models, policies and practices relating to expense reimbursement; how EDS' reneged on commitments made by the prior leadership at the time of the ATK acquisition; and the targeting of senior ATK executives for termination by Brown and other top EDS managers.

      18.     John Andrica. Mr. Andrica is a former ATK senior executive. He is knowledgeable about differences between EDS' and ATK's business models, policies and practices relating to expense reimbursement; how EDS' reneged on commitments made by the prior leadership at the time of the ATK acquisition; and the targeting of senior ATK executives for termination by Brown and other top EDS managers.

      19.     Larry Kohn. Mr. Kohn is a former ATK senior executive. He is knowledgeable about differences between EDS' and ATK's business models, policies and practices relating to expense reimbursement; how EDS' reneged on commitments made by the prior leadership at the time of the ATK acquisition; and the targeting of senior ATK executives for termination by Brown and other top EDS managers.

      20.     Paul Inglis. Mr. Inglis is a former ATK senior executive. He is knowledgeable about differences between EDS' and ATK's business models, policies and practices relating to expense reimbursement; how EDS' reneged on commitments made by the prior leadership at the time of the ATK acquisition; and the targeting of senior ATK executives for termination by Brown and other top EDS managers.

21.    Thomas Howard.  Mr. Howard is a former ATK senior executive.  He is knowledgeable about differences between EDS' and ATK's business models, policies and practices relating to expense reimbursement; how EDS' reneged on commitments made by the prior leadership at the time of the ATK acquisition; and the targeting of senior ATK executives for termination by Brown and other top EDS managers.

22.    Dale Marco.  Mr. Marco is a former ATK senior executive.  He is knowledgeable about differences between EDS' and ATK's business models, policies and practices relating to expense reimbursement; how EDS' reneged on commitments made by the prior leadership at the time of the ATK acquisition; and the targeting of senior ATK executives for termination by Brown and other top EDS managers.

23.    Avi Porat.  Mr. Porat is a former ATK senior executive.  He is knowledgeable about differences between EDS' and ATK's business models, policies and practices relating to expense reimbursement; how EDS' reneged on commitments made by the prior leadership at the time of the ATK acquisition; and the targeting of senior ATK executives for termination by Brown and other top EDS managers.

24.    Doug Aldrich.  Mr. Aldrich is a former ATK senior executive.  He is knowledgeable about differences between EDS' and ATK's business models, policies and practices relating to expense reimbursement; how EDS' reneged on commitments made by the prior leadership at the time of the ATK acquisition; and the targeting of senior ATK executives for termination by Brown and other top EDS managers.

25.    John Anderson.  Mr. Anderson is a former ATK senior executive.  He is knowledgeable about differences between EDS' and ATK's business models, policies and practices relating to expense reimbursement; how EDS' reneged on commitments made by the

prior leadership at the time of the ATK acquisition; and the targeting of senior ATK executives for termination by Brown and other top EDS managers.

26.     Marty Joyce. Mr. Joyce is a former ATK senior executive. He is knowledgeable about differences between EDS' and ATK's business models, policies and practices relating to expense reimbursement; how EDS' reneged on commitments made by the prior leadership at the time of the ATK acquisition; and the targeting of senior ATK executives for termination by Brown and other top EDS managers.

27.     Al Morrison. Mr. Morrison is a former ATK senior executive. He is knowledgeable about differences between EDS' and ATK's business models, policies and practices relating to expense reimbursement; how EDS' reneged on commitments made by the prior leadership at the time of the ATK acquisition; and the targeting of senior ATK executives for termination by Brown and other top EDS managers.

28.     Peter Wagner. Mr. Wagner is a former ATK senior executive who served on the Board of Management and the Board of Directors. He is knowledgeable about the differences between ATK's and EDS' business models, policies and practices relating to expense reimbursement; Defendant's travel patterns and work habits; Defendant's customary business development activities; and the Board of Directors' encouragement of Defendant to host client dinners and other business relationship development functions.

29.     Other current and former ATK officers who served in various capacities on ATK's former Board of Directors, Board of Management, and Vice President Performance Evaluation and Compensation Committee, including P. Banks, M. Hora, M. Tuerks, W. Bornmann, D. Gray, and Michele Azzarello. These individuals are knowledgeable about the differences between ATK's and EDS' business models, policies and practices relating to expense

-15-

reimbursement; Defendant's travel patterns and work habits; Defendant's customary business development activities; the Board of Directors' encouragement of Defendant to host client dinners and other business relationship development functions; and how EDS' reneged on commitments made by the prior leadership at the time of the ATK acquisition.

30.     Members of ATK's Communications Department in 1995, including Mary Lynn Coyle and Janet Woodward.  These individuals are knowledgeable about the preparations for the January 7, 1995 business entertainment client dinner and the universal knowledge within ATK that the theme of the dinner was Vroni Steingraber's 50th birthday.

31.     William Schultz.  Mr. Schultz is the former Chief Financial Officer and Controller of ATK.  He is knowledgeable about ATK's policies and practices regarding expense reimbursement; Defendant's customary business development activities; the millions of dollars in consulting fees paid to ATK by the companies whose leaders attended the business dinners that are the subject of Plaintiff's claims; and the approval of Defendant's expense reports including the expenses for the January 7, 1995 client dinner.

32.     Other members of ATK's and EDS' Accounting Departments between 1995 and 2002.  These individuals are knowledgeable about EDS' and ATK's policies and practices regarding expense reimbursement; Defendant's customary business development activities; the millions of dollars in consulting fees paid to ATK by the companies whose leaders attended the business dinners that are the subject of Plaintiff's claims; and the approval of Defendant's expense reports.  Defendant cannot recall the names of these individuals but their names are known or available to Plaintiff.

33.     Jennifer Schulte, ATK.  Ms. Schulte is believed to be knowledgeable about aspects of Plaintiff's purported "investigation" of Defendant.

34.     Richard Brown, EDS.  Mr. Brown is knowledgeable about EDS' campaign to artificially inflate EDS revenues and profits; EDS' calculation of the "exit" costs of highly compensated ATK executives if those individuals were terminated for reasons other than "Cause;" the targeting of senior ATK executives for termination; Defendant's repeated cautions to Brown and other top EDS managers regarding their questionable business decisions; Brown's replacement of Defendant as CEO of ATK; Defendant's subsequent demand that EDS either retain him as Chairman Emeritus or as a consultant, or pay him the millions of dollars to which he was entitled to under his special retention agreement; Plaintiff's purported "investigation" of Defendant; EDS' policies and practices with regard to business entertainment expenses, and Brown's own business entertainment activities.

35.     Jim Daley, EDS.  Mr. Daley is knowledgeable about EDS' campaign to artificially inflate EDS' revenues and profits; EDS' calculation of the "exit" costs of highly compensated ATK executives if those individuals were terminated for reasons other than "Cause;" the targeting of senior ATK executives for termination; Defendant's repeated cautions to Brown and other top EDS managers regarding their questionable business decisions; Brown's replacement of Defendant as CEO of ATK; Defendant's subsequent demand that EDS either retain him as Chairman Emeritus or as a consultant, or pay him the millions of dollars to which he was entitled to under his special retention agreement; Plaintiff's purported "investigation" of Defendant; and EDS' own policies and practices with regard to business entertainment expenses.

36.     Niul Burton.  Mr. Burton is a former employee of EDS and is knowledgeable about the company's selective enforcement of its Code of Conduct.

37.     Deitmar Oestermann, ATK.  Mr. Oestermann is knowledgeable about EDS' calculation of the "exit" costs of highly compensated ATK executives if those individuals were

-17-

terminated for reasons other than "Cause;" the targeting of senior ATK executives for termination; and business entertainment expenses that he has incurred on behalf of ATK.

38.     Nick Linn, EDS. Mr. Linn is knowledgeable about EDS' calculation of the "exit" costs of highly compensated ATK executives if those individuals were terminated for reasons other than "Cause;" the targeting of senior ATK executives for termination; and Plaintiff's purported "investigation" of Steingraber.

39.     Troy Todd, EDS. Mr. Todd is knowledgeable about EDS' calculation of the "exit" costs of highly compensated ATK executives if those individuals were terminated for reasons other than "Cause;" the targeting of senior ATK executives for termination; and Defendant's demand that EDS either buy him out, retain him as a consultant, or pay him the millions of dollars to which he was entitled to under his retention agreement

40.     Members of EDS' Legal Department who participated in the "investigation" of Defendant. The names of these individuals are unknown to Defendant but are known to Plaintiff. These individuals are knowledgeable about the details of the investigation.

41.     Members of EDS' Public Relations and Marketing Department. These individuals are knowledgeable about EDS' policies and practices with regard to business entertainment expenses. The names of these individuals are unknown to Defendant but are known to Plaintiff.

42.     Members of EDS' Accounting Department. These individuals are knowledgeable about EDS' polices, procedures and practices with regard to reimbursement of business entertainment and travel expenses; EDS' efforts to artificially boost profits by slashing the compensation and benefits paid to senior ATK executives; EDS' recording and reporting as assets purported receipts from contracts structured as percentage-of-completion payment

-18-

arrangements prior to receipt of same; and EDS' calculation of the "exit" costs of highly compensated ATK executives if those individuals were terminated for reasons other than "Cause." The names of these individuals are unknown to Defendant but are known to Plaintiff.

43.     Members of ATK's and EDS' Human Resources Department. These individuals are knowledgeable about ATK's and EDS' policies and procedures regarding to the conduct of investigations and disciplinary proceedings against employees.

44.     EDS' outside counsel who assisted in the "investigation" of Defendant. The names of these individuals are unknown to Defendant but are known to Plaintiff. These individuals are knowledgeable about the details of the investigation.

45.     Gary Fernandes, former Vice Chairman, EDS. Mr. Fernandes is knowledgeable about the 1995 merger between EDS and ATK, the conditions established by ATK and Steingraber for consideration of the merger, and EDS' agreement to said conditions.

46.     Lester Alberthal, former CEO, EDS. Mr. Alberthal is knowledgeable about the 1995 merger between EDS and ATK, the conditions established by ATK and Steingraber for consideration of the merger, and EDS' agreement to said conditions.

47.     Urliker Drager-Lisen, ATK. Ms. Drager-Lisen is the Controller in ATK's Dusseldorf offices. She is knowledgeable about business entertainment expenses incurred by ATK and its current CEO, Deitmar Ostermann.

48.     Claus Hommer, ATK. Mr. Hommer is the Marketing Director for ATK's Dusseldorf offices. He is knowledgeable about marketing events and business entertainment expenses incurred by ATK and its current CEO, Deitmar Ostermann.

49.     Niko Soellner, ATK.  Mr. Soellner is an executive in ATK's Dusseldorf offices. He is knowledgeable about marketing events and business entertainment expenses incurred by ATK and its current CEO, Deitmar Ostermann.

50.     Klaus Dieter Maier, ATK.  Mr. Dieter Maier is knowledgeable about the differences between ATK's and EDS' business models, policies and practices relating to expense reimbursement; and marketing events and business entertainment expenses incurred by ATK and its current CEO, Deitmar Ostermann.

51.     George Abigail.  Mr. Abigail is a former CFO of ATK.  He is knowledgeable about the differences between ATK's and EDS' business models, policies and practices relating to expense reimbursement; EDS' calculation of the "exit" costs of highly compensated ATK executives if those individuals were terminated for reasons other than "Cause;" and the targeting of senior ATK executives for termination.

52.     Mark Miller.  Mr. Miller is a former ATK senior executive.  He is knowledgeable about differences between ATK's and EDS' business models, policies and practices relating to expense reimbursement.  He might also be knowledgeable about the selective enforcement of EDS' Code of Conduct.

53.     Ben Rattle, ATK.  Mr. Rattle is an IT manager who advised Defendant that the deletion of old emails and drafts from Defendant's computer hard drive would not result in the permanent destruction of the electronic files from the system.

54.     Terry Krush, ATK.  Mr. Krush is an internal auditor in the Accounting Department.  He is knowledgeable about the fact that the propriety of Defendant's expense reports were never called into question during the entire seven and one-half year period in

question. He might also be knowledgeable about other mistakes Defendant made in preparing and submitting timesheets.

55.    Deborah Martin. Ms. Martin is a former EDS employee. She is knowledgeable about EDS' selective enforcement of its Code of Conduct and accounting tactics that were designed to artificially inflate earnings and profits.

56.    Jeff Emans. Mr. Emans is a former ATK human resources executive. He is knowledgeable about the personal animosity that Dick Brown harbored toward Defendant and the targeting of senior ATK executives for termination.

57.    John Frenzel. Mr. Frenzel is a former internal auditor for EDS. He is knowledgeable about EDS' campaign to artificially inflate revenues and profits.

58.    M. Schule, G. Morton, JW Broekhuysen, and J. Kuhn. These former ATK employees are knowledgeable about the disparate treatment between themselves and other ATK senior executives who were targeted for termination by Brown and other top EDS managers.

59.    David Webster. Mr. Webster is the former General Counsel of ATK. He is knowledgeable about how EDS reneged on commitments made by prior management at the time of the ATK acquisition, and the targeting of ATK senior executives for termination by Brown and other top EDS managers.

**E.    Indemnity Agreements**

Defendant may be entitled to indemnity with respect to some or all of Plaintiff's claims herein, including the payment of attorney fees and expenses, pursuant to an indemnity agreement between Defendant and ATK dated December 20, 1994. A copy of this agreement is attached hereto.

**F.**     <u>Settlement Agreements</u>

There are no settlement agreements relating to the subject matter of this action.

**G.**     <u>Witness Statements</u>

Defendant is unaware of the existence of any witness statements described in Tex. R.

Civ. P. 192.3(j).

**H.**     <u>Medical Records and Bills</u>

Not applicable in this case.

Respectfully submitted,

**FREDERICK G. STEINGRABER**

By:_____
One of his attorneys

Clyde M. Siebman
State Bar No.18341600
Lawrence A. Phillips
State Bar No. 15937755
421 North Crockett
Sherman, Texas 75090
(903) 870-0070 - Telephone
(903) 870-0066 - Telecopy

**Of Counsel:**

Steven P. Handler
David F. Wentzel
McDermott, Will & Emery
227 West Monroe Street
Chicago, Illinois  60606-5096
(312) 372-2000 – Telephone
(312) 984-7700 – Telecopy

Firm # 90539

## CERTIFICATE OF SERVICE

I, David Wentzel, attorney for Fred Steingraber, state that I served a copy of the attached

**Defendant's Rule 26 Initial Disclosures** upon:

> Weston C. Loegering
> Hughes & Luce, L.L.P.
> Bank One Center
> 1717 Main Street, Suite 2800
> Dallas, TX 75201
>
> Martin T. Wymer
> Duvin, Cahn & Hutton
> Erieview Tower, 20th Floor
> 1301 East Ninth Street
> Cleveland, OH 44114

by Federal Express on December 19, 2002.

_____
David F. Wentzel

CHI99 4037863-1.060540.0011

## INDEMNIFICATION AGREEMENT

This Agreement is entered into as of this 20th day of December, 1994 by and between A. T. KEARNEY, INC., a Delaware corporation (the "Corporation"), and Fred G. Steingraber ("Indemnitee").

WHEREAS, competent persons are becoming more reluctant to serve corporations as directors or officers unless they are provided with adequate protection through insurance or adequate indemnification against inordinate risks of claims and actions against them arising out of their service to and activities on behalf of the corporation; and

WHEREAS, the current impracticability of obtaining adequate insurance and the uncertainties relating to indemnification have increased the difficulty of attracting and retaining such persons; and

WHEREAS, the Board of Directors of the Corporation has determined that these constraints on its ability to attract and retain such persons is detrimental to the best interests of the Corporation and its shareholders and that the Corporation should act to assure such persons that there will be increased certainty of such protection in the future; and

WHEREAS, Section 145(f) of the Delaware General Corporation Law contemplates that directors, officers, employees and agents can be granted indemnification rights pursuant to an agreement between such person and the Corporation in addition to those provided by law; and

WHEREAS, it is reasonable, prudent and necessary for the Corporation contractually to obligate itself to indemnify such persons to the fullest extent permitted by applicable law so that they will serve or continue to serve the Corporation free from undue concern for litigation claims for damages arising out of or related to the performance of such service; and

WHEREAS, Indemnitee is willing to serve, continue to serve and to take on additional service for or on behalf of the Corporation or a subsidiary on the condition that Indemnitee be indemnified to the fullest extent permitted by applicable law;

NOW, THEREFORE, in consideration of the premises and the covenants contained herein, the Corporation and Indemnitee agree as follows:

ARTICLE I

DEFINITIONS

For purposes of this Agreement, the following terms shall have the meaning given here:

1.1.   "Corporate Status" describes the status of a person who is, was or has agreed to serve as, a director, officer, employee, agent or fiduciary of the Corporation, and the status of a person who is or was serving at the request of the Corporation as a director, officer, partner, trustee, employee or agent of another foreign or domestic corporation, partnership, joint venture, trust, other enterprise or employee benefit plan.

1.2.   "D&O Insurance" means any valid directors' and officers' liability insurance policy maintained by the Corporation for the benefit of the Indemnitee, if any.

1.3.   "Disinterested Director" means a director of the Corporation who is not and was not a party to the Proceeding or subject to an asserted claim in respect of which indemnification is sought by Indemnitee.

1.4.   "Excluded Claim" means any payment for Losses or Expenses in connection with any Proceeding:  (i) based upon or attributable to Indemnitee gaining in fact any personal profit or advantage to which Indemnitee is not entitled; (ii) for the return by Indemnitee of any remuneration paid to Indemnitee which is illegal; (iii) resulting from Indemnitee's knowingly fraudulent, dishonest or willful misconduct; or (iv) the payment of which by the Corporation under this Agreement is not permitted by applicable law.

1.5.   "Expenses" shall include all reasonable attorneys' fees, retainers, court costs, transcript costs, fees of experts, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees, and all other disbursements or expenses of the types customarily incurred in connection with prosecuting, defending, preparing to prosecute or defend, investigating, or being or preparing to be a witness in a Proceeding.

1.6.   "Good faith" shall mean Indemnitee having acted in good faith and in a manner Indemnitee reasonably believed to be in and not opposed to the best interests of the Corporation and, with respect to any criminal Proceeding, having had no reasonable cause to believe Indemnitee's conduct was unlawful.

1.7.   "Losses" means any amounts or sums which Indemnitee is legally obligated to pay as a result of a Proceeding including, without limitation, damages, judgments and sums of amounts paid in settlement of a Proceeding, and any fine,

penalty or with respect to an employee benefit plan, any excise tax or penalties assessed with respect thereto.

1.8.  "Proceeding" includes any action, suit, arbitration, alternate dispute resolution mechanism, investigation, administrative hearing or any other actual, threatened or completed proceeding whether civil, criminal, administrative or investigative, whether formal or informal, or any appeal therefrom, in which Indemnitee was or is a party or threatened to be made a party by reason of his or her Corporate Status or by reason of anything allegedly done or not done by him or her in any such capacity, other than a proceeding initiated by the Indemnitee without the prior written consent of the Corporation.

## ARTICLE II

### TERM OF AGREEMENT

This Agreement shall continue until and terminate upon the later of:  (i) the expiration of all applicable statutes of limitations; or (ii) the final termination of all pending Proceedings in respect of which Indemnitee is granted rights of indemnification or advancement of Expenses hereunder and of any proceeding commenced by Indemnitee regarding the interpretation or enforcement of this Agreement.

## ARTICLE III

### INDEMNIFICATION PROCEDURES

Section 3.1.  <u>Notification</u>.  Promptly after receipt by Indemnitee of notice of any Proceeding, Indemnitee shall, if indemnification with respect thereto may be sought from the Corporation under this Agreement, notify the Corporation of the commencement thereof; <u>provided</u>, <u>however</u>, that the failure to give such notice promptly shall not affect or limit the Corporation's obligations with respect to the matters described in the notice of such Proceeding, except to the extent that the Corporation is prejudiced thereby.  Indemnitee agrees further not to make any admission or effect any settlement with respect to such Proceeding without the written consent of the Corporation, except any Proceeding with respect to which the Indemnitee has undertaken the defense in accordance with the last sentence of Section 3.4.

Section 3.2.  <u>Notice to D&O Insurer</u>.  If, at the time of the receipt of such notice, the Corporation has D&O Insurance in effect, the Corporation shall give prompt notice of the commencement of a Proceeding covered by the D&O Insurance to the insurers in accordance with the procedures set forth in the

respective policies.  The Corporation shall thereafter take all necessary or desirable action to cause such insurers to pay, on behalf of Indemnitee, all Losses and Expenses payable as a result of such Proceeding in accordance with the Corporation's written policies and procedures.

   Section 3.3.  <u>Payment of Expenses</u>.  To the extent the Corporation does not, at the time of the Proceeding, have applicable D&O Insurance, or if a determination is made that any Expenses arising out of such Proceeding will not be payable under the D&O Insurance then in effect, the Corporation shall be obligated to pay the Expenses actually incurred in connection with any Proceeding in advance of the final disposition thereof and the Corporation, if appropriate, shall be entitled to assume the defense of such Proceeding, with counsel reasonably satisfactory to Indemnitee, upon the delivery to Indemnitee of written notice of its election so to do.  After delivery of such notice, the Corporation will not be liable to Indemnitee under this Agreement for any legal or other Expenses subsequently incurred by Indemnitee in connection with such defense other than reasonable Expenses of investigation; <u>provided</u> that Indemnitee shall have the right to employ its counsel in such Proceeding but the fees and expenses of such counsel incurred after delivery of notice from the Corporation of its assumption of such defense shall be at the Indemnitee's expense; <u>provided further</u> that if: (i) authorized in writing by the Corporation, (ii) counsel which has been provided by the Corporation reasonably determines after its engagement that its continued representation of Indemnitee would present it with a conflict of interest, (iii) Indemnitee reasonably determines that there may be legal defenses available to him or her which are different from or in addition to those available to the Corporation, or (iv) the Corporation shall not, in fact, have employed counsel to assume the defense of such action, the reasonable fees and expenses of counsel shall be at the expense of the Corporation; <u>provided further</u>, that the Corporation shall not in any event be liable for the fees and expenses of more than one firm of attorneys in any jurisdiction representing Indemnitee in any one action or group of related actions.

   Section 3.4.  <u>Time for Payment</u>.  All payments on account of the Corporation's indemnification obligations under this Agreement shall be made within thirty (30) days of Indemnitee's written request therefor unless a determination is made that the Proceeding giving rise to Indemnitee's request is an Excluded Claim or otherwise not payable under this Agreement, <u>provided that</u> all payments on account of the Corporation's obligation to pay Expenses under Section 3.3 of this Agreement prior to the final disposition of any Proceeding shall be made within 15 days of Indemnitee's written request therefor unless a determination is made that such payment would constitute an "Excluded Claim" but shall be subject to Section 3.5 of this Agreement.  Indemnitee's requests for the Corporation to pay

Expenses hereunder shall be accompanied by appropriate
documentation evidencing the Expenses so incurred by Indemnitee.
In the event the Corporation takes the position that Indemnitee
is not entitled to indemnification in connection with any
Proceeding, Indemnitee shall have the right at his own expense to
undertake defense of any such Proceeding, insofar as such
Proceeding involves the Indemnitee, by written notice given to
the Corporation within 10 days after the Corporation has notified
Indemnitee in writing of its contention that Indemnitee is not
entitled to indemnification; provided, however, that the failure
to give such notice within such 10-day period shall not affect or
limit the Corporation's obligations with respect to any such
Proceeding if such Proceeding is subsequently determined not to
be an Excluded Claim and that Indemnitee, therefor, is entitled
to be indemnified under the provisions of Article IV hereof, the
Corporation shall promptly indemnify Indemnitee.

        Section 3.5.  Reimbursement.  Indemnitee hereby
expressly undertakes and agrees to reimburse the Corporation for
all Losses and Expenses paid by the Company in connection with
any Proceeding against Indemnitee in the event and only to the
extent that a determination shall have been made by a court of
competent jurisdiction in a decision from which there is no
further right to appeal that Indemnitee is not entitled to be
indemnified by the Corporation for such Losses and Expenses
because the Proceeding is an Excluded Claim or because Indemnitee
is otherwise not entitled to payment under this Agreement or
applicable law.

        Section 3.6.  Settlement.  The Corporation shall have
no obligation to indemnify Indemnitee under this Agreement for
any amounts paid in settlement of any Proceeding effected without
the Corporation's prior written consent.  The Corporation shall
not settle any Proceeding in which it takes the position that
Indemnitee is not entitled to indemnification in connection with
such settlement without the consent of Indemnitee, nor shall the
Corporation settle any Proceeding in any manner which would
impose any fine, penalty or any obligation on Indemnitee, without
Indemnitee's written consent.  Neither the Corporation nor
Indemnitee shall unreasonably withhold its or his consent to any
proposed settlement.


                        ARTICLE IV

                      INDEMNIFICATION

        Section 4.1.  In General.  The Corporation shall
indemnify and advance Expenses to Indemnitee in connection with
any Proceeding as provided in this Agreement and to the fullest
extent permitted by applicable law in effect on the date hereof
and to such greater extent as applicable law may thereafter from
time to time permit.

                            -5-

Section 4.2.  <u>Third Party Actions</u>.  If Indemnitee was or is a party or is threatened to be made a party to any Proceeding (other than a Proceeding by or in the right of the Corporation) by reason of his or her Corporate Status, or by reason of anything done or not done by him in any such capacity, the Corporation shall indemnify Indemnitee against any and all Losses and Expenses actually incurred by or for Indemnitee in connection with the investigation, defense, settlement or appeal of such Proceeding or any claim, issue or matter therein if he or she acted in Good Faith and payment thereof would not be prohibited by Section 4.7 hereof.

Section 4.3.  <u>Derivative Actions</u>.  If Indemnitee was or is a party or is threatened to be made a party to any Proceeding by or in the right of the Corporation to procure a judgment in its favor by reason of his Corporate Status, or by reason of anything done or not done by him in any such capacity, the Corporation shall indemnify him against any and all Expenses actually incurred by or for him or her in connection with the investigation, defense, settlement, or appeal of such Proceeding if he or she acted in Good Faith and payment thereof would not be prohibited by Section 4.6 hereof; except that no indemnification under this Section 4.3 shall be made in respect of any claim, issue or matter as to which such person shall have been finally adjudged to be liable to the Corporation by a court of competent jurisdiction, unless and then only to the extent, the court in which such Proceeding was brought shall determine upon application that, despite the adjudication of liability (but in view of all the circumstances of the case), such person is fairly and reasonably entitled to indemnity for such amounts which such court shall deem proper.

Section 4.4.  <u>Indemnification of a Party Who is Wholly or Partly Successful</u>.  To the extent that Indemnitee is, by reason of Indemnitee's Corporate Status, a party to and is successful, on the merits or otherwise, in any Proceeding, Indemnitee shall be indemnified to the maximum extent permitted by law, against any and all Losses and Expenses actually incurred by or for him or her in connection therewith.  If Indemnitee is not wholly successful in such Proceeding but is successful, on the merits or otherwise, as to one or more but less than all claims, issues or matters in such Proceeding, the Corporation shall indemnify Indemnitee to the maximum extent permitted by law, against all Losses and Expenses actually and reasonably incurred by or for him or her in connection with each successfully resolved claim, issue or matter.  For purposes of this Section 4.4 and without limitation, the termination of any claim, issue or matter in such a Proceeding by a final and non-appealable order of dismissal, with or without prejudice, shall be deemed to be a successful result as to such claim, issue or matter, so long as there has been no finding (either adjudicated or pursuant to Article V) that Indemnitee did not act in Good Faith.

-6-

Section 4.5.   <u>Indemnification for Expenses of a</u>
<u>Witness</u>.   To the extent that Indemnitee is, by reason of
Indemnitee's Corporate Status, a witness in any Proceeding,
Indemnitee shall be indemnified against all Expenses actually and
reasonably incurred by or for such Indemnitee in connection
therewith.

Section 4.6.   <u>Limitation on Indemnification</u>.
Notwithstanding any other provision of this Agreement, Indemnitee
shall not be indemnified and held harmless from any Losses or
Expenses (a) which have been determined, as provided herein, to
constitute an Excluded Claim; (b) to the extent Indemnitee is
indemnified by the Corporation and has actually received payment
pursuant to the Corporation's Certificate of Incorporation, By-
Laws, the Delaware General Corporation Law, D&O Insurance or
otherwise; or (c) other than pursuant to Section 5.3, in
connection with any Proceeding initiated by Indemnitee, unless
the Corporation has joined in or the Board of Directors has
authorized such Proceeding.


ARTICLE V
DETERMINATION OF RIGHT TO INDEMNIFICATION

Section 5.1.   <u>Forum for Determination</u>.   Indemnitee
shall be entitled to select the manner in which the determination
will be made that Indemnitee is entitled to indemnification from
among the following:

(a)   A majority vote of Disinterested Directors, even
though less than a quorum;

(b)   The shareholder(s) of the Corporation;

(c)   If there are Disinterested Directors, independent
legal counsel selected by a majority vote of such
Disinterested Directors, even though less than a quorum;

(d)   In the event that the Corporation is directly or
indirectly controlled by another corporation or entity,
independent legal counsel selected by Indemnitee and
approved by a majority vote of the Board of Directors of the
Corporation, in which directors who are parties to a
Proceeding may participate (which approval shall not be
unreasonably withheld); or

(e)   a court acting pursuant to Section 145(k) of the
Delaware General Corporation Law or any other court of
competent jurisdiction.

Authorization of indemnification and determination as to
reasonableness shall be made in the same manner as the
determination that indemnification is permissible, except that if

-7-

the determination that indemnification is permissible is made by independent legal counsel, authorization of indemnification and determination as to reasonableness of expenses shall be made in the manner specified in subsections (c) or (d) of this Section 5.1 for the selection of such counsel.  Indemnitee shall cooperate with the person or persons making such determination with respect to Indemnitee's entitlement to indemnification, including providing to such person upon reasonable advance request any documentation or information that is not privileged or otherwise protected from disclosure and that is reasonably available to Indemnitee and reasonably necessary to such determination.  For purposes of this Agreement, "independent legal counsel" means a law firm, or a member of a law firm, that is experienced in matters of corporation law and neither contemporaneously is, nor in the three years theretofore has been, retained to represent (a) the Corporation (or any entity controlling the Corporation) or Indemnitee in any matter material to either such party, or (b) any other party to the Proceeding giving rise to a claim for indemnification hereunder. Notwithstanding the foregoing, the term "independent legal counsel" shall not include any person who, under the applicable standards of professional conduct then prevailing, would have a conflict of interest in representing either the Corporation or Indemnitee in an action to determine Indemnitee's rights under this Agreement.  Any such independent legal counsel so selected shall affirm in writing to the Corporation and Indemnitee that it satisfies the requirements of such definition.

Section 5.2.  <u>Right to Appeal</u>.  Notwithstanding a determination by any forum listed in clauses (a) through (d) of Section 5.2 hereof that Indemnitee is not entitled to indemnification with respect to a specific Proceeding, Indemnitee shall have the right to apply to the court in which that Proceeding is or was pending, or any other court of competent jurisdiction, for the purpose of enforcing Indemnitee's right to indemnification or contribution pursuant to this Agreement.  Indemnitee shall commence such action seeking such an adjudication within 180 days following the date on which Indemnitee first has the right to commence such action pursuant to this Section 5.2, or such right shall expire.

Section 5.3.  <u>Expenses under this Agreement</u>.  Except with respect to an Excluded Claim, the Corporation shall indemnify Indemnitee against all Expenses actually incurred by Indemnitee in connection with any hearing or proceeding under this Article V involving Indemnitee and against all Expenses actually incurred by Indemnitee in connection with any other action between the Corporation and Indemnitee involving the interpretation or enforcement of the rights of Indemnitee under this Agreement.

## ARTICLE VI

### PRESUMPTIONS AND EFFECT OF CERTAIN PROCEEDINGS

Section 6.1. <u>Burden of Proof</u>. In making a determination with respect to entitlement to indemnification hereunder, the person or persons or entity making such determination shall presume that Indemnitee is entitled to indemnification under this Agreement and the Corporation shall have the burden of proof to overcome that presumption in connection with the making by any person, persons or entity of any determination contrary to that presumption.

Section 6.2. <u>Effect of Other Proceedings</u>. The termination of any Proceeding or of any claim, issue or matter therein, by judgment, order, settlement or conviction, or upon a plea of nolo contendere or its equivalent, shall not of itself adversely affect the right of Indemnitee to indemnification to the extent permitted by this Agreement or applicable law.

Section 6.3. <u>Reliance as Safe Harbor</u>. In making a determination with respect to entitlement to indemnification hereunder, the person or persons or entity making such determination shall recognize that Indemnitee is entitled to rely in good faith on the records or books of account of the Corporation, including financial statements, or, in the case of an Indemnitee who is a director, on information supplied to Indemnitee by the officers of the Corporation in the course of their duties, or on the advice of legal counsel for the Corporation or on information or records given or reports made to the Corporation by an independent certified public accountant or by an appraiser or other expert selected with reasonable care by the Corporation. The provisions of this Section 6.3 shall not be deemed to be exclusive or to limit in any way the other circumstances in which the Indemnitee may be deemed to have met the applicable standard of conduct set forth in this Agreement.

Section 6.4. <u>Actions of Others</u>. The knowledge and/or actions, or failure to act, of any director, officer, agent or employee of the Corporation shall not be imputed to Indemnitee for purposes of determining the right to indemnification under this Agreement.

## ARTICLE VII

### NON-EXCLUSIVITY, INSURANCE, SUBROGATION

Section 7.1. <u>Non-Exclusivity</u>. The rights of indemnification and to receive advancement of Expenses as provided by this Agreement shall not be deemed exclusive of any other rights to which Indemnitee may at any time be entitled under applicable law, the Corporation's Certificate of

-9-

Incorporation, the By-Laws, any agreement, a vote of shareholders or a resolution of directors, or otherwise.

Section 7.2. <u>Insurance</u>. The Corporation may maintain an insurance policy or policies against liability arising out of this Agreement or otherwise.

Section 7.3. <u>Subrogation</u>. In the event of any payment under this Agreement, the Corporation shall be subrogated to the extent of such payment to all of the rights of recovery of Indemnitee, who shall execute all papers required and take all action necessary to secure such rights, including execution of such documents as are necessary to enable the Corporation to bring suit to enforce such rights.

Section 7.4. <u>No Duplicative Payment</u>. **The** Corporation shall not be liable under this Agreement to make any payment of amounts otherwise indemnifiable hereunder if and to the extent that Indemnitee has otherwise actually received such payment under any insurance policy, contract, agreement or otherwise.


ARTICLE VIII

GENERAL PROVISIONS

Section 8.1. <u>Successors and Assigns</u>. This Agreement shall be binding upon the Corporation and its successors and assigns and shall inure to the benefit of Indemnitee and Indemnitee's heirs, executors and administrators.

Section 8.2. <u>Severability</u>. If any provision or provisions of this Agreement shall be held to be invalid, illegal or unenforceable for any reason whatsoever the validity, legality and enforceability of the remaining provisions of this Agreement (including without limitation, each portion of any Section of this Agreement containing any such provision held to be invalid, illegal or unenforceable, that is not itself invalid, illegal or unenforceable) shall not in any way be affected or impaired thereby, and to the fullest extent possible, the provisions of this Agreement (including, without limitation, each portion of any Section of this Agreement containing any such provision held to be invalid, illegal or unenforceable, that is not itself invalid, illegal or unenforceable) shall be construed so as to give effect to the intent manifested by the provision held invalid, illegal or unenforceable.

Section 8.3. <u>No Adequate Remedy</u>. The parties declare that it is impossible to measure in money the damages which will accrue to either party by reason of a failure to perform any of the obligations under this Agreement. Therefore, if either party shall institute any action or proceeding to enforce the provisions hereof, such party against whom such action or

-10-

proceeding is brought hereby waives the claim or defense that
such party has an adequate remedy at law, and such party shall
not urge in any such action or proceeding the claim or defense
that the other party has an adequate remedy at law.

     Section 8.4.  <u>Modification and Waiver</u>.  No supplement,
modification or amendment of this Agreement shall be binding
unless executed in writing by both of the parties hereto.  No
waiver of any of the provisions of this Agreement shall be deemed
or shall constitute a waiver of any other provisions hereof
(whether or not similar) nor shall such waiver constitute a
continuing waiver.  No amendment, rescission or replacement of
this Agreement or any provision hereof shall be effective as to
Indemnitee with respect to any action taken or omitted by such
Indemnitee in Indemnitee's Corporate Status prior to such
amendment, alteration, rescission or replacement.

     Section 8.5.  <u>Notices</u>.  All notices, requests, demands
and other communications hereunder shall be in writing and shall
be deemed to have been duly given if (i) delivered by hand and
receipted for by the party to whom said notice or other
communication shall have been directed, or (ii) mailed by
certified or registered mail with postage prepaid, on the third
business day after the date on which it is so mailed:

     If to Indemnitee, as shown with Indemnitee's signature
below.

     If to the Corporation to:

     A. T. Kearney, Inc.
     222 West Adams Street
     Chicago, Illinois  60606
     Attention:  Vice President and General Counsel

or to such other address as may have been furnished to Indemnitee
by the Corporation or to the Corporation by Indemnitee, as the
case may be.

     Section 8.6.  <u>Governing Law</u>.  The parties agree that
this Agreement shall be governed by, and construed and enforced
in accordance with, the laws of the State of Delaware without
application of the conflict of laws principles thereof.

     Section 8.7.  <u>Entire Agreement</u>.  This Agreement may be
executed in one or more counterparts.  Except as provided in the
following sentence, this Agreement constitutes the entire
agreement and understanding between the parties hereto in
reference to all the matters herein agreed upon.  The rights
conferred in this Agreement are in addition to, and supplement,
any other rights Indemnitee may have had at any time under
applicable law, the Corporation's Certificate of Incorporation,
the By-Laws, and any prior understanding.

-11-

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

A. T. KEARNEY, INC.

By _John W. Egan_

Its _John W. Egan_

INDEMNITEE:

_____
(signature)

FRED G. STEINGRABER
(printed name)

Address: 611 WARWICK ROAD
KENILWORTH, Illinois 60043

**EXHIBIT 6**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| ELECTRONIC DATA SYSTEMS CORPORATION, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 4:02CV225 |
| FRED G. STEINGRABER, | § § | |
| Defendant. | § § | |

## DEFENDANT'S OBJECTIONS AND REVISED ANSWERS TO INTERROGATORIES

Defendant Fred G. Steingraber ("Steingraber"), by his undersigned attorneys, pursuant to Fed. R. Civ. P. 33, for his objections and answers to plaintiff's First Set of Interrogatories, states as follows:

## GENERAL OBJECTIONS

The following general objections are incorporated into each of the specific objections and responses below.

1.      Defendant objects to the Interrogatories to the extent that they purport to require the identification of documents and information that are protected from disclosure by the attorney-client privilege, the work product doctrine, any other privilege or immunity.

2.      Defendant objects to the interrogatories to the extent that they purport to call for the identification of documents and disclosure of information containing confidential or proprietary commercial, client or other business information.  Such information and/or documents will be provided only pursuant to the Protective Order already in place in this case.

3.      Defendant objects to the Interrogatories (and to the Definitions and Instructions therein) to the extent that they purport to seek discovery beyond the limits permitted by the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the Eastern District of Texas.

4.      Defendant objects to the Interrogatories to the extent that they are duplicative, cumulative, and seek information that may be obtained from other sources that are more convenient, less burdensome, or less expensive.

5.      Defendant objects to the Interrogatories to the extent that they are not reasonably calculated to lead to the discovery of relevant information but instead are intended to annoy, harass, or embarrass Mr. Steingraber or any third parties.

6.      Defendant objects to Plaintiff's interrogatories to the extent that they seek information that is not within Mr. Steingraber's possession, custody or control.

7.      The failure to object to an Interrogatory or a statement that responsive information or documents will be made available does not constitute an acknowledgement that any responsive information or documents exist or are in Mr. Steingraber's possession, custody or control.

8.      Defendant submits these responses to the Interrogatories without conceding the relevance or admissibility of the subject matter of any interrogatory, and without prejudice to its right to object to further discovery concerning the subject matter of the interrogatory.  In responding to the Interrogatories, defendant does not waive and expressly reserves any and all objections to the authenticity, competency, or materiality at trial of any information or documents produced, provided, disclosed, set forth, identified or referred to in these responses.

-2-

## ANSWERS TO INTERROGATORIES

1.      Identify each entity (including, but not limited to, public or private corporations and/or not-for-profit organizations) for which you serve or served on the board of directors, management board, or any other sort of oversight committee at any time during the period 1994-2002, including:

        a.      the period for which you served as a member of the board or committee;

        b.      whether you submitted requests to be reimbursed for expenses incurred in attending board or committee meetings and, if so, the name of the person to whom you submitted reimbursement requests;

        c.      whether you incurred expenses in connection with such board or committee service for which you did not seek reimbursement;

        d.      the entity's policy on the reimbursement of expenses incurred by board or committee members and/or the compensation of board or committee members; and

        e.      whether you discussed in any way the subject matter of EDS' Complaint, Amended Complaint, or your Counterclaim in this case with anyone affiliated with such board, committee, corporation, or other entity and, if so, the name of the person with whom you had that discussion.

**ANSWER:**      Defendant objects to this interrogatory on the grounds that it is overly broad, unduly burdensome, and seeks information not relevant to the subject matter of the litigation nor reasonably calculated to lead to the discovery of relevant, admissible evidence. Subject to and without waiving these objections, defendant states as follows:

**(a)**      Between 1994 and 2002, I served on the board of directors of the following corporations and organizations:

| Company/Organization | Dates Served on Board |
| --- | --- |
| Maytag Corporation | 1994 to present |
| Lawter International | 1994 – 1999 |
| Mercury Finance Company | 1994-1999 |

| | |
|---|---|
| Southeastern Thrift and Bank Fund (John Hancock Financial Trends Fund) | 1994 to present |
| Chicago Council on Foreign Relations | 1994 to present |
| The Conference Board | 1994 – 1996 |
| The National Association of Manufacturers | 1994 – 1995 |
| The Economic Club of Chicago | 1994 – 1997 |
| Northwestern Healthcare Network | 1994 – 1997 |
| Children's Memorial Hospital | 1994 – 1999 |
| Indiana University Foundation | 1996 to present |
| Indiana University Business School | 1994 – 2001 |
| Konrad Adenauer Program for European Policy Studies | 1999 to present |
| University of Chicago Business School | 1994 – 2001 |
| Continental AG | 1999 to present |
| 3I Group PLC | 2002 to present |
| The Mid America Committee | 1994 – 2001 |

**(b)**     Pursuant to Fed. R. Civ. P. 33(e), defendant has produced documents from which the information requested by this subpart (b) may be ascertained.  Additional documents containing responsive information are also in the possession of EDS and/or ATK.  Specifically, defendant's timesheets, correspondence, and expense reports contain information about whether requests for expenses relating to board meetings were submitted, the names of the persons to whom the requests were directed, and the amount of such expenses.

-4-

(c)      I probably incurred miscellaneous expenses relating to some board meetings,

particularly for the not-for-profit organizations, for which I did not seek reimbursement.  I do not

recall the specifics of any particular such expenses.

(d)      I was never given any written policies from any of these boards or organizations

relating to the reimbursement of directors' expenses.

(e)      I have advised several of these entities of the litigation and potential subpoenas,

including John Hancock Financial Trends Fund (Frank Golden, Chairman and President; Ray

Pascual, General Counsel to the board); Maytag Corporation (Roger Scholten, Sr. Vice President

and General Counsel; Ralph Hake, Chairman and CEO); Continental AG (Dr. Huburtus von

Grunburg, Chairman); 3I Group PLC (Tony Brierley, Secretary and General Counsel; Baroness

Sarah Hogg, Chairman); the University of Chicago Business School (Edward Snyder, Dean); and

the Chicago Council on Foreign Relations (Marshall Bouton, President).

2.      Identify every financial institution (including, but not limited to, banks or
brokerages) at which you maintain or have maintained an account, including for each financial
institution, the account numbers for any and all accounts that you maintain or have maintained
since January 1, 1994.

**ANSWER:**      Defendant objects to this interrogatory as overly broad, calculated

to harass, and seeking information not relevant to the subject matter of the litigation nor

reasonably calculated to lead to the discovery of relevant, admissible evidence.

3.      Provide the address of every home, residence, and/or vacation home you or your
wife, Veronika Steingraber, together or separately own, have owned, have purchased, or have
sold since January 1, 1994, including but not limited to, properties in Kenilworth, Illinois, Vail,
Colorado, and Hilton Head, South Carolina, and state whose name(s) appears on the deed.

**ANSWER:**      Defendant objects to this interrogatory as overly broad, calculated

to harass, and seeking information not relevant to the subject matter of the litigation nor

reasonably calculated to lead to the discovery of relevant, admissible evidence.

4.     Identify every charitable contribution you have made in your name or your wife's name since January 1, 1994 for which you obtained or sought reimbursement from EDS or ATK, including:

   a. the entity to which the contribution was made and in whose name(s) the contribution was made;

   b. the date on which the contribution was made and the amount of the contribution; and

   c. whether you claimed a deduction for the contribution on your income tax returns, state and/or federal, and if so, for which taxable year you claimed the deduction(s).

   **ANSWER:** The only charitable contributions that I recall making for which I received reimbursement from ATK are the following: (1) $1000 contribution to Catholic Charities in July 1999, and (2) $1000 contribution to Catholic Charities in 1998. I do not remember the date of the latter contribution. The checks that I wrote to make these contributions were inadvertently included with the other records relating to charitable contributions that were sent to my accountant for use in preparing my tax returns. As a result, these contributions were mistakenly included in the totals for my charitable contributions for 1998 and 1999. Amended tax returns for those years have been filed to correct the mistake.

5.     Identify each and every lawsuit in which you have personally been a party - excluding those actions in which A.T. Kearney was a co-party. For each lawsuit, state the full caption, including named parties, index or case number, forum and the name of the judge, and any publication or electronic database citation(s) to decisions, findings, or orders in the matter.

   **ANSWER:** Defendant objects to this interrogatory as overly broad, unduly burdensome, calculated to harass, and seeking information not relevant to the subject matter of the litigation nor reasonably calculated to lead to the discovery of relevant, admissible evidence. Subject to and without waiving these objections, defendant states as follows:

   I was named as a defendant in a series of cases against Mercury Finance Company based on my status as a member of the Board of Directors, including the following:

-6-

| Caption | Plaintiff's Counsel | Nature of Proceeding |
|---|---|---|
| **Federal Court** | | |
| William Holder, On Behalf of Himself and All Others Similarly Situated v. Mercury Finance Co., John N. Brincat, John N. Brincat, Jr., James A. Doyle, Clifford R. Johnson, Andrew McNally IV and Philip J. Wicklander, Fred G. Steingraber<br><br>Case No: 97 C 0655<br><br>Judge(s): Williams/Bobrick | MUCH, SHELIST, FREED, DENENBERG, AMENT, BELL & RUBENSTEIN, P.C.<br>Michael Freed<br>Michael B. Hyman<br>Joseph D. Ament<br>200 N. LaSalle St., Ste. 2100<br>Chicago, IL 60603<br>(312) 346-3100<br><br>BERNSTEIN, LITOWITZ, BERGER & GROSSMANN, LLP<br>Vincent R. Cappucci<br>Kevin McGee<br>1285 Avenue of the Americas<br>New York, NY 10019<br>(212) 554-1400 | §10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and 78t(a), SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 |
| Claude Pizio and David J. Isaak, on Behalf of Themselves and all Others Similarly Situated, v. Mercury Finance Co., John N. Brincat, John N. Brincat, Jr., James A. Doyle, Bradley, Bradley S. Vallem, Clifford R. Johnson, Andrew McNally, IV and Philip J. Wicklander, Fred G. Steingraber<br><br>Case No: 97 C 2141<br><br>Judge: Ashman | ROBINSON, CURLEY & CLAYTON<br>Fay Clayton<br>300 S. Wacker Drive, Ste. 1700<br>Chicago, IL 60606<br>(312) 663-3100<br><br>MAGER, LIEBENBERG & WHITE<br>Ann D. White<br>Two Penn Center Plaza<br>Philadelphia, PA 19102<br>(215) 569-6921<br><br>BERNSTEIN, LITOWITZ, BERGER & GROSSMANN, LLP<br>Max W. Berger<br>Vincent R. Cappucci<br>1285 Avenue of the Americas<br>New York, NY 10019<br>(212) 554-1400 | Section 10(b) of the Exchange Act, 15 U.S.C. §§78j(b), and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") |
| **Illinois Circuit Court** | | |
| Keith H. Thorp, Jr., Kay R. Thorp, Beatrice Borre and Stanley Manne, derivatively on behalf of Mercury Finance Co.<br>v.<br>Mercury Finance Co., John N. Brincat, Dennis H. Chookaszian, William C. Croft, Clifford R. Johnson, Andrew McNally IV, Bruce I. McPhee, Fred G. Steingraber, Philip J. Wicklander, James A. Doyle, Charley A. Pond, Richard P. Bosson, John J. Pratt and KPMG Peat Marwick, LLP<br><br>Case No: 97 CH 1440 | GORDON, GLICKMAN & FLESCH<br>James S. Gordon<br>140 S. Dearborn St., Ste. 404<br>Chicago, IL 60603<br>(312) 346-1080 | DERIVATIVE ACTION |

| Caption | Plaintiff's Counsel | Nature of Proceeding |
|---|---|---|
| Judge: Durkin [consolidated with 97 C 3039 and 97 C 3639] | | |
| George C. Pontikes, Harriet Pontikes, Rebecca Pontikes, Rachael Pontikes, Elizabeth Pontikes, Nora Kopsian, Barbara Kopsian, Elanor Kopsian, Demetri Konstantelos, Donald Ryan, Elias Kondelis, Martha Mills Papas, Frances V. Papas, Betty Z. Collias, and A. Patrick Papas, <br> v. <br> John N. Brincat, John N. Brincat, Jr., James A. Doyle, Charley A. Pond, Bradley S. Vallem, William C. Croft, Clifford R. Johnson, Bruce McPhee, Dennis H. Chookaszian, Andrew McNally IV, Fred G. Steingraber, Philip J. Wicklander, KPMG-Peat Marwick, LLP, James M. Reynolds, Mercury Finance Co., a Delaware Corporation, and James D. Terra, Executor of the Estate of Daniel J. Terra, Deceased <br><br> Case No: 97 CH 3039 <br><br> Judge: Durkin [consolidated w/ 97 C 3039 and 97 C 1440] | Donald L. Johnson <br> Tobin M. Richter <br> 33 North Dearborn St., Ste. 1401 <br> Chicago, IL 60602 <br> (312) 263-7000 | DERIVATIVE ACTION |
| **Delaware Chancery Court** | | |
| Annalee Wexler, derivatively on behalf of Mercury Finance Co. <br> v. <br> John N. Brincat, Dennis H. Chookazian, William C. Croft, Clifford R. Johnson, Andrew McNally, IV, Bruce I. McPhee, Fred G. Steingraber, Phillip J. Wicklander, KPMG Peat Marwick, and Mercury Finance Co. <br><br> Case No: 15512-NC <br><br> Judge: | CHIMCLES, JACOBSEN & TICKELLIS <br> Pamela S. Tikellis <br> James C. Strum <br> Robert J. Kriner, Jr. <br> Daniel P. O'Brien <br> One Rodney Square <br> P.O. Box 1035 <br> Wilmington, DE 19899 <br> (302) 656-2500 | DERIVATIVE ACTION |
| Mark Krasnow, derivatively on behalf of Mercury Finance Co. <br> v. <br> John N. Brincat, Dennis H. Chookazian, William C. Croft, Clifford R. Johnson, Andrew McNally, IV, Bruce I. McPhee, Fred G. Steingraber, Phillip J. Wicklander, KPMG Peat Marwick, and Mercury Finance Co. <br><br> Case No: 15525-NC | ROSENTHAL, MONHAIT, GROSS & GODDESS <br> Mellon Bank Center, Ste. 1401 <br> P.O. Box 1070 <br> Wilmington, DE 19899-1070 <br> (302) 656-4433 <br><br> A. ARNOLD GERSHON, ESQ. <br> 295 Madison Ave., Ste. 1126 <br> New York, NY 10017 <br> (212) 684-3033 | DERIVATIVE ACTION |

| Caption | Plaintiff's Counsel | Nature of Proceeding |
|---|---|---|
| Judge: | | |
| Michael R. Trausch, Trustee<br>v.<br>John N. Brincat, William C. Croft, Clifford R. Johnson, Andrew McNally IV, Fred G. Steingraber, Philip J. Wicklander, Bruce McPhee and Dennis H. Chookaszian, and Mercury Finance Company,<br><br>Case No: 15524-NC<br><br>Judge: | ROSENTHAL, MONHAIT, GROSS & GODDESS, P.A.<br>Mellon Bank Center, Ste. 1401<br>P.O. Box 1070<br>Wilmington, DE 19899-1070<br>(302) 656-4433 | DERIVATIVE ACTION |
| Charles W. Damaskus,<br>v.<br>John N. Brincat, William C. Croft, Clifford R. Johnson, Andrew McNally IV, Fred G. Steingraber, Philip J. Wicklander, Bruce McPhee and Dennis H. Chookaszian, and Mercury Finance Company,<br><br>Case No: 15546-N.C.<br><br>Judge: | ROSENTHAL, MONHAIT, GROSS & GODDESS, P.A.<br>Mellon Bank Center, Ste. 1401<br>P.O. Box 1070<br>Wilmington, DE 19899-1070<br>(302) 656-4433<br><br>SCHUBERT & REED, LLP<br>Robert C. Schubert<br>Juden Justice Reed<br>Two Embarcadero Center<br>Ste. 1050<br>San Francisco, CA 94111<br>(415) 788-4220 | DERIVATIVE ACTION |
| Mindy Schwartz,<br>v.<br>John N. Brincat, Dennis H. Chookaszian, William C. Croft, Clifford R. Johnson, Andrew McNally IV, Bruce I. McPhee, Fred G. Steingraber, Philip J. Wicklander, James A. Doyle, John M. Brincat, Jr. and KPMG Peat Marwick LLP<br><br>Case No: CA 15567<br><br>Judge: | CHIMCLES, JACOBSEN & TICKELLIS<br>Pamela S. Tikellis<br>James C. Strum<br>Robert J. Kriner, Jr.<br>Daniel P. O'Brien<br>One Rodney Square<br>P.O. Box 1035<br>Wilmington, DE 19899<br>(302) 656-2500<br><br>GOODKIND, LABATON, RUDOFF & SUCHAROW<br>100 Park Avenue – 12th Floor<br>New York, NY 10017<br>(212) 907-077 | DERIVATIVE ACTION |
| Richard G. Grinnell,<br>v.<br>John N. Brincat, Dennis H. Chookaszian, William C. Croft, Clifford R. Johnson, Andrew McNally IV, Bruce I. McPhee, Fred G. Steingraber, Philip J. Wicklander, James A. Doyle, John M. Brincat, Jr. and KPMG Peat Marwick, LLP<br><br>Case No: 15568-NC | CHIMCLES, JACOBSEN & TICKELLIS<br>Pamela S. Tikellis<br>James C. Strum<br>Robert J. Kriner, Jr.<br>Daniel P. O'Brien<br>One Rodney Square<br>P.O. Box 1035<br>Wilmington, DE 19899<br>(302) 656-2500<br><br>ZWERLING, SCHACHTER & | DERIVATIVE ACTION |

| Caption | Plaintiff's Counsel | Nature of Proceeding |
|---|---|---|
| Judge: | ZWERLING, LLP<br>767 Third Avenue<br>New York, NY 10017-2023<br><br>STEVEN E. CAULEY, P.A.<br>400 West Capitol Ave., Ste. 1700<br>Little Rock, AR 72201<br><br>JOHN C. EARL, ESQ.<br>400 West Capitol Ave., Ste. 1700<br>Little Rock, AR 72201 | |
| Judith V. Cumming<br>v.<br>John N. Brincat, Dennis H. Chookaszian, William C. Croft, Clifford R. Johnson, Andrew McNally IV, Bruce I. McPhee, Fred G. Steingraber, Philip J. Wicklander, James A. Doyle, John M. Brincat, Jr. and KPMG Peat Marwick, LLP<br><br>Case No: 15569<br><br>Judge: | CHIMCLES, JACOBSEN & TICKELLIS<br>Pamela S. Tikellis<br>James C. Strum<br>One Rodney Square<br>P.O. Box 1035<br>Wilmington, DE 19899<br>(302) 656-2500<br><br>CHIMCLES, JACOBSEN & TICKELLIS<br>One Haverford Center<br>361 West Lancaster Avenue<br>Haverfor, PA 19041-0100<br>(610) 642-8500 | DERIVATIVE ACTION |
| Judy H. Sutherland,<br>v.<br>John N. Brincat, William C. Croft, Clifford R. Johnson, Andrew McNally IV, Fred G. Steingraber, Philip J. Wicklander, Bruce McPhee, and Dennis H. Chookaszian and Mercury Finance Co.,<br><br>Case No: 15582-NC<br><br>Judge: | ROSENTHAL, MONHAIT, GROSS & GODDESS, P.A.<br>Mellon Bank Center, Ste. 1401<br>P.O. Box 1070<br>Wilmington, DE 19899-1070<br>(302) 656-4433<br><br>LAW OFFICES OF JAMES F. HUMPHREYS<br>Mark McNair<br>1919 Pennsylvania Avenue, N.W.<br>Suite 300<br>Washington, DC 20006<br>(202) 736-2191 | DERIVATIVE ACTION |
| Jack V. Wulf Trustee,<br>v.<br>John N. Brincat, William C. Croft, Clifford R. Johnson, Andrew McNally IV, Fred G. Steingraber, Philip J. Wicklander, Bruce McPhee and Dennis H. Chookaszian and Mercury Finance,<br><br>Case No: 15581-NC<br><br>Judge: | ROSENTHAL, MONHAIT, GROSS & GODDESS, P.A.<br>Mellon Bank Center, Ste. 1401<br>P.O. Box 1070<br>Wilmington, DE 19899-1070<br>(302) 656-4433<br><br>Donald A. Statland, Esq.<br>55 West Monroe Street, Ste. 600<br>Chicago, IL 60603<br>(312) 726-3898 | DERIVATIVE ACTION |

6.     State whether you ever have been involved in a criminal investigation, including as a subject, target, or witness. If the answer is "yes," identify the state and county in which the investigation occurred, whether criminal charges were filed against you, and if the answer is "yes," for each instance in which criminal charges were filed, state the full caption, including named parties, index number, forum and the name of the judge, the charges, and whether you were convicted.

**ANSWER:**    Defendant objects to this interrogatory as overly broad, calculated to harass, and seeking information not relevant to the subject matter of the litigation nor reasonably calculated to lead to the discovery of relevant, admissible evidence. Subject to and without waiving these objections, defendant states as follows:

I have never been involved in a criminal investigation as a subject, target or witness.

7.     Identify each individual whom you believe engaged in conduct that you contend in your Counterclaim constitutes a material breach of the Agreement by EDS.

**ANSWER:**    Defendant objects to this interrogatory as vague, overly broad, and premature. Discovery is in the beginning stages and information responsive to this information remains exclusively within the possession and control of EDS. Subject to and without waiving these objections, defendant states as follows:

I believe that numerous individuals were involved in the scheme to uncover adverse information about me to be used as a pretext to terminate my employment agreement, including but not limited to the individuals identified in the pleadings and the parties' Rule 26 disclosures in this case. In particular, Dick Brown, Jim Daley, Troy Todd, and Rick DeNey complained repeatedly about the compensation, stock, options, and benefits received by senior ATK executives, including me. I believe that these individuals targeted me and other ATK executives for termination to save millions in salaries, bonuses, stock, options, benefits and perquisites, as part of a broader scheme to artificially inflate EDS' profits. Other aspects of this scheme included employing questionable accounting practices in booking contingent revenue; pressure

-11-

to pull revenue forward; misrepresenting the predictability of future cash flows and profits by touting anticipated revenue that EDS would supposedly receive from various long term contracts, without disclosing that payments under such contracts were not guaranteed; failing to disclose that EDS' revenue from its IT outsourcing business is highly susceptible to interruption due to terms in EDS' service contracts that allow customers to unilaterally suspend discretionary spending on IT outsourcing; failing to disclose the risk to EDS' cash flow presented by certain new contracts, including a $6.9 billion contract with the U.S. Navy and Marine Corps; and failing to disclose that the company's European contracts were performing below expectations.

Additionally, I believe that Dick Brown, Jim Daley and other senior EDS management harbored animosity toward me because of my frequent complaints about their poor business decisions and efforts to wrest control of ATK by systematically changing its business model and culture, compensation structure, and entrepreneurial environment.  I believe that these individuals, along with other EDS personnel including Nick Linn, Storrow Gordon, and other members of EDS' legal department, conspired before or after receiving the alleged "tip" referred to in paragraph 20 of EDS' answer to the counterclaim to develop adverse information about me to be used as a pretext to terminate my employment.  Pursuant to this scheme, EDS management instructed Kathleen Frawley, Joe Hendrix, and others, including FTI Consulting, Inc., to pore through eight years of my expense reports (at a cost in excess of $200,000), looking for items that EDS could assert were improper.  Additionally, these individuals conducted "interviews" with several members of my staff and, upon information and belief, pressured them to "cooperate" or to spin" the facts to make it appear that my conduct was wrongful.  Upon information and belief, Ms. Wegman retained personal legal counsel to advise her regarding EDS' demands for cooperation because she felt pressured by these demands.  Also upon

-12-

information and belief, Ms. Ramiciotti received favorable treatment in exchange for her "cooperation" in the investigation.

I do not know the names of all of the individuals involved in EDS' scheme to terminate my employment because this information is contained within documents exclusively in EDS' possession and control.  I understand that my attorneys have requested the production of relevant documents on these subjects from EDS.  Defendant will supplement his answer to this interrogatory as discovery proceeds and as required by the Federal Rules of Civil Procedure and applicable scheduling orders entered by the Court.

8.     Identify all persons whom you contend in your Counterclaim received reimbursement from EDS or ATK for personal entertainment, personal travel, travel on behalf of other entities, personal charitable contributions, or who submitted reimbursements more than once for the same expenses, state whether each such expense was approved by EDS or ATK and, if known, identify the person who approved each such expense.

**ANSWER:**     Defendant objects to this interrogatory as vague, overly broad, and premature.  Discovery is in the beginning stages and information responsive to this information remains exclusively within the possession and control of EDS.  Furthermore, the allegations of the Counterclaim relating to EDS' business entertainment practices go beyond the types of expenses and reimbursement requests referenced in this interrogatory.  Subject to and without waiving these objections, defendant states as follows:

I believe that ATK and EDS spent millions on lavish entertainment of clients, prospective clients and staff at events having social, entertainment and quasi-social themes, not unlike the events that I hosted which EDS now claims were not legitimate business entertainment events. In particular, Brown and other EDS senior executives entertain clients and prospective clients at sporting events including the Superbowl, the Kentucky Derby, professional football and baseball games, auto racing events, and World Cup soccer tournaments; on cruises, islands and at luxury resorts and spas; and at their personal vacation homes.  Brown, in particular, entertains clients

-13-

and company executives at his estate on a private island on Moosehead Lake, Maine, flying guests in the company's Gulfstream jet and providing lavish food, beverages, gifts and entertainment during their stay.  At the 2001 Comdex party in Las Vegas, EDS spent millions of dollars on business entertainment and promotion.

Additionally, EDS sponsors internal team-building and morale-boosting exercises that are similar to the team-building ATK Vice President dinners that I hosted, which EDS also claims were improper.  For example, as part of its annual sales recognition and incentive program, EDS takes all of its top salesmen on exotic trips and cruises, or host multi-day, all expense paid retreats and galas.  Dietmar Ostermann, in particular, has spent millions on Christmas parties, monthly new consultant welcoming parties, and "business" meetings and functions for ATK personnel, as well as clients and prospective clients.  Upon information and belief, Mr. Ostermann spent $1.4 million on a single "business" meeting of ATK personnel in Hamburg, Germany in October 2000, including the cost of oysters and champagne, and truckloads of sand delivered for beach and volleyball games.

I also attended an elaborate dinner and evening of entertainment in Munich that Mr. Ostermann hosted for clients and prospective clients as part of the ATK Leadership Circle. This particular event was titled, "Classical Inspirations – Musik Verstehen Der Geliebte Irrtum" (Understanding Music, the Beloved Error), an inspirational concert with Gideon Kremer and the Kremerata Baltica on May 12, 2000 in the beautiful Prinzregentheater (Gartensaal).  Monica Hohlmeier, the Bavarian State Minister for Education and Culture, spoke about the culture of Bavaria.  Gideon Kremer, one of the world's foremost violinists, played and directed a concert with his orchestra, the Kremerata Baltica.  In addition, the three-star Michelin chef, Heinz Winkler, prepared an elaborate gourmet meal with exquisite champagne, wines, liquors, and

-14-

cognacs, and gave a talk on food.  Dietmar Ostermann, in addition to paying for this lavish party

including an honorarium and donation to Gideon Kremer, gave Mr. Kremer a special gift of

expensive aluminum suitcases.  Some 80 plus guests attended.  This was just one in a long series

of events held over time with different entertainment themes to develop and build relationships.

In addition, I believe that Dietmar Ostermann and members of his family used, for their

personal benefit and enjoyment, assets or property of ATK and/or EDS, including but not limited

to a property located in Dusseldorf, Germany and one at 142 Priory Lane, London, England.  I

also believe that Dietmar Ostermann obtained personal loan guarantees from ATK and/or EDS

for the benefit of himself and his family, and that the value of these guarantees (and the use of

the Dusseldorf and London properties) vastly exceeds the value of the ATK laptop computer that

EDS claims my son improperly obtained and used.  Upon information and belief, Mr. Ostermann

also kept thousands of dollars' worth of wine and champagne left over from the ATK parties he

hosted in his home.  Additional information regarding EDS' and ATK's business entertainment

expenses, and the use of ATK or EDS property by employees' family members, is contained

within documents and records in EDS' and ATK's possession and control.

9.    Identify each person who has been used for consultation who is not expected to be
called as an expert witness at trial, but whose opinions or impressions have been reviewed by a
testifying expert, and indicate for each the subject matter on which the witness was consulted,
the mental impressions and opinions held by the expert, and the facts known to the expert
which relate to or form the basis of the mental impressions and opinions held by the expert.

**ANSWER:**    None at this time.

10.    Identify all individuals at EDS or ATK to whom you submitted requests for
reimbursement of expenses incurred by you since January 1, 1994.  For each such individual,
identify the dates of the requests for reimbursement and the dollar amount and/or nature of the
expense for which you sought reimbursement.

**ANSWER:**    Defendant objects to this interrogatory as overly broad, unduly

burdensome, and seeking information not relevant to the subject matter of the litigation nor

-15-

reasonably calculated to lead to the discovery of relevant, admissible evidence.  Defendant

further objects to this request to the extent that it seeks information relating to the period prior to

EDS' acquisition of ATK.  Subject to and without waiving these objections, defendant states as

follows:

I did not submit requests for reimbursement of expenses to specific individuals.  I gave

my timesheets and expense reports to my administrative assistants, along with the receipts and

other backup materials.  My assistants then compiled and forwarded these materials to ATK's

accounting department.  I understand that once received in the accounting department, expense

reports were randomly assigned to one of several auditors for review and approval.  I also

understand that occasionally, Bill Schultz or Bruce Harrison would review and approve my

expense reports.  Beginning in 2000, Dick Brown's office reviewed and approved my expense

reports.  Detailed information regarding the dates of my expense reports, the dollar amounts of

reimbursed items, and the nature of each expense is contained within the documents and records

in EDS' and ATK's possession.

11.    Identify all individuals whom you or your representatives (including, but not
limited to, your attorneys) have interviewed and/or obtained a statement (either written, oral,
taped, or otherwise preserved) concerning the subject matter of EDS' Amended Complaint or
your Answer and Counterclaim.  For each individual identified, provide the dates the interview
was conducted and/or statement provided, and the form of the statement (i.e., oral, written, video
or audiotape, etc. ).

**ANSWER:**    Defendant objects to this interrogatory as vague, overly broad,

unduly burdensome and seeking information not relevant to the subject matter of the litigation

nor reasonably calculated to lead to the discovery of relevant, admissible evidence.  Defendant

further objects to this interrogatory to the extent that it seeks information about the identity of

witnesses interviewed by defendant's counsel (as opposed to the identity of witnesses who have

information relevant to the parties' claims and defenses) on the ground that such information is

-16-

protected from disclosure by the work product doctrine.  Subject to and without waiving these

objections, defendant states as follows:

I have not interviewed or obtained statements from anyone regarding the subject matter

of EDS' Amended Complaint or my Answer and Counterclaim.  I speak to individuals about

issues that are directly or indirectly related to this litigation on a daily basis, since many of my

colleagues, business associates, firm clients, friends and family members are concerned about the

litigation and have asked about or commented on the allegations.  All of these conversations

have been oral, except for a few instances in which a colleague or friend has written or faxed

comments regarding the litigation.

12.    Identify and/or describe all documents you caused to be destroyed and/or deleted
on August 5 and/or 6, 2002.

**ANSWER:**    I did not destroy or delete any documents on August 5 or 6, 2002.

While cleaning out my office and conference room, I told my assistant, Cheryl Wegman, that she

could dispose of drafts or duplicate hard copies of documents relating to personal matters,

including several drafts of letters relating to my father's death and the administration of his

estate; old telephone rosters; hand-written drafts of personal letters; some Walgreen's pharmacy

records; letters sent on behalf of my son seeking employment opportunities; a 2003 calendar;

drafts of some corporate governance documents; old contact lists; notes to my brother and sisters

regarding insurance matters; letters or drafts to my gardener, a caretaker, and my father's former

employer; unsent catalog and gift orders; and a thank-you letter to the Chairman of 3i  for an

invitation to attend the opera after a board meeting in London.

The materials I gave to Ms. Wegman to discard also might have included a couple of

emails involving a request by a board member for the names of candidates for an open position,

and perhaps some communications on corporate governance initiatives on which the boards I sat

-17-

on were working.  None of the materials that I asked Ms. Wegman to discard involved ATK

business or requests for reimbursement of expenses to either ATK or any outside boards.  All of

the above were in accordance with my normal practice to instruct my administrative assistants to

file or purge redundant documents, or to retrieve personal documents for my files.

I also told Ms. Wegman that she could delete drafts and files relating to these matters on

my computer, but only after confirming with her that any deleted files would still remain within

the overall ATK computer system.  This was in accordance with my normal practice to

periodically purge any draft, junk or duplicative documents on my hard drive that I did not need.

I took my copies of some of the personal letters and materials in question, copies of which are

being produced herewith (Bates numbers FGS 14786 – 14812).  Drafts or copies of these

documents probably were among the materials that I asked Ms. Wegman to discard.

13.    You have stated in your Rule 26(a) Preliminary Calculation of Damages that you
may seek damages for "mental anguish" in this case.  Accordingly, please identify (consistent
with definition number 12 of these Interrogatories) all physicians, surgeons, psychiatrists,
psychologists, or other mental or physical health care professionals who have examined you, or
from whose you have sought evaluation or treatment for any psychological or mental illness or
condition, or any physical illness or condition that may be caused or otherwise affected by stress
or other mental condition, and for each such person, please state:

        a.    The date or dates of examination, consultation, or treatment;

        b.    The condition for which: such examination, consultation, or
             treatment was provided; and

        c.    A description of the treatment provided, including listing any
             medications prescribed by such medical provider.

-18-

**ANSWER:**

(a)    I complained about stress and anxiety during a visit with Dr. Mitchell King in the

fall of 2002.  Dr. King referred me to a psychiatric department.  I have not yet set an appointment

but plan to do so shortly.

                                        As to objections:


By: _____
                One of the attorneys for defendant


Clyde M. Siebman
State Bar No.18341600
Lawrence A. Phillips
State Bar No. 15937755
Siebman, Reynolds & Burg LLP
421 North Crockett
Sherman, Texas 75090
(903) 870-0070 - Telephone
(903) 870-0066 - Telecopy

Steven P. Handler
David F. Wentzel
McDermott, Will & Emery
227 West Monroe Street
Chicago, Illinois  60606-5096
(312) 984-7789

## **VERIFICATION**

I, Frederick G. Steingraber, certify that I have read the foregoing Objections and Answers to Plaintiff's First Set of Interrogatories, and that the answers therein are true and correct to the best of my knowledge, except as to those matters stated to be on information and belief and as to such matters I certify that I believe them to be true and correct.

Date:   February 14, 2003

Frederick G. Steingraber

I, David Wentzel, attorney for Fred Steingraber, state that I served a copy of the attached

**DEFENDANT'S OBJECTIONS AND REVISED ANSWERS TO PLAINTIFF'S FIRST**

**SET OF INTERROGATORIES** upon:

> Weston C. Loegering
> Hughes & Luce, L.L.P.
> Bank One Center
> 1717 Main Street, Suite 2800
> Dallas, TX 75201
>
> Martin T. Wymer
> Duvin, Cahn & Hutton
> Erieview Tower, 20th Floor
> 1301 East Ninth Street
> Cleveland, OH 44114

by Federal Express on February 14, 2003.

_____
David F. Wentzel